**Lewis duPont SMITH**

v.

**Lawrence E. WOOD, et al.**

**Civ. A. No. 86–3670.**

United States District Court,
E.D. Pennsylvania,
Civil Division.

Sept. 17, 1986.

James B. Crummett, Philadelphia, Pa., for plaintiff.

David R. Weyl, Administrative Office of the Pennsylvania Courts, Philadelphia, Pa., for defendants.

## MEMORANDUM

SCIRICA, District Judge.

Lewis duPont Smith has petitioned this court under 42 U.S.C. § 1983 seeking declaratory and injunctive relief against the application of the Pennsylvania guardianship laws, 20 Pa.Cons.Stat.Ann. § 5501(1) and (2)[1] (Purdon 1975). Specifically, Smith alleges that a ruling by Judge Lawrence Wood of the Court of Common Pleas of Chester County, declaring Smith incompetent to manage his estate, deprived him of his constitutional rights in violation of the First Amendment freedom of speech and association relating to his expression of political beliefs. This court has jurisdiction pursuant to 28 U.S.C. § 1343(3) and 28 U.S.C. § 1331.

Members of Smith's family, the defendants in this action, invoked the "guardianship of the estate" provision of section 5501 in the Chester County action. Smith claims that Judge Wood's ruling brings his family members within the purview of § 1983, which protects him from deprivations of federal, constitutional, and statutory rights "under color of" state law. See 42 U.S.C. § 1983.

The defendant family members, E. Newbold Smith, Margaret duPont Smith, et al., have filed a motion asking me to dismiss Smith's section 1983 claim and/or to abstain from intervening in an ongoing state court proceeding.[2] Similarly, defendant, Judge Wood, urges me to abstain and further alleges that he is not a proper party to this suit. In reviewing a motion to dismiss, see Fed.R.Civ.P. 12(b)(6), I am bound to construe the complaint in the light most favorable to the plaintiff, and I may not dismiss unless plaintiff can prove no set of facts that would entitle him to relief. *Angelastro v. Prudential-Bache Securities, Inc.,* 764 F.2d 939, 944 (3d Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 267, 88 L.Ed.2d 274 (1985).

Because I hold that the section 1983 action against Smith's family members does not meet the statutory requirement of state action, I grant defendants' motion to dismiss. In addition, I further hold that Judge Wood, sued in his neutral capacity as a trial judge, is not a proper party to this suit. Finally, although not essential to the disposition of this action, I rule that abstention would be proper in a situation such as this, despite plaintiff's First Amendment challenge to the state conservatorship statute.

Before turning to the legal resolution of this case, I shall briefly review the factual setting in which this case arose.

Defendant family members instituted state court proceedings before Judge Wood in April, 1985, alleging that under the conservatorship statute, plaintiff, age 28, had a "mental illness" that rendered him unable to manage his property, or "liable to dissipate it or become the victim of designing persons." 20 Pa.Cons.Stat.Ann. § 5501. The family members contended that indications of plaintiff's mental illness coincided with his increased involvement with a political organization headed by Lyndon LaRouche. At the time, Judge Wood found that plaintiff's estate was valued at 1.5 million dollars and he had loaned $212,000 to a LaRouche organization. Smith had received only a $75,000 unsecured promissory note and was prepared to loan LaRouche's group additional sums of money. Judge Wood issued a preliminary in-

---

1. Plaintiff acknowledges that his challenge to section 5501(2), (which applies to a guardianship of the person proceeding) has become moot as a result of a ruling denying the guardianship by Judge Wood.

2. Smith has appealed Judge Wood's ruling to the Pennsylvania Superior Court.

junction barring plaintiff from "making any expenditures of any type where such funds will directly or indirectly benefit any political or charitable organizations" without prior written approval of the court. Judge Wood specifically identified organizations associated with LaRouche as falling within the term "political or charitable organizations."

In a subsequent ruling issued July 23, 1986, Judge Wood, applying section 5501, heard testimony concerning plaintiff's mental status and concluded that plaintiff was clearly suffering from a mental illness as defined by state law. As a result, Judge Wood named the Wilmington Trust Co. guardian of plaintiff's estate.[3] In a subsequent proceeding, Judge Wood rejected the family's request that he impose a guardianship of the person on plaintiff pursuant to section 5501(2). Throughout the state court proceedings, plaintiff maintained that imposition of the conservatorship law was a "blatant interference with his constitutional rights, particularly his First Amendment rights."

In his § 1983 complaint filed with this court in June 1986, plaintiff alleged that the state law was unconstitutional as applied to him by Judge Wood. Upon receipt of defendants' motion to dismiss, plaintiff attempted to recast his allegation as a facial attack on the Pennsylvania statute.

Even assuming that plaintiff has mounted facial challenge, which I find problematic, my holding is the same and I am compelled to dismiss plaintiff's suit.

## I. State Action Requirement of Section 1983.

Section 1983,[4] enacted in the wake of blatant civil rights violations during the post-Civil War years, altered the landscape of federalism in this country. Congress enacted the provisions "to interpose the federal courts between the States and the people, as guardians of the people's federal rights—to protect the people from unconstitutional action under color of state law...." *Mitchum v. Foster*, 407 U.S. 225, 242, 92 S.Ct. 2161, 2155, 32 L.Ed.2d 705 (1972) (quoting *Ex parte Virginia*, 100 U.S. (10 OTTO) 339, 346, 25 L.Ed. 676 (1879)). Thus, as the statute provides, plaintiff must meet the threshold requirement of acting under the color of state law—or as the requirement is often stated, of being a state actor. *See U.S. v. Price*, 383 U.S. 787, 797 n. 7, 86 S.Ct. 1152, 1157 n. 7, 16 L.Ed.2d 267 (1966) ("under color of state law" and "state action" requirements identical).

The defendant family members, who initiated the state proceedings resulting in this action, are private citizens—not state officials. Thus, standing alone, they clear-

---

**3.** Under the state court order, plaintiff receives $5,000 per month of after-tax income to use as he sees fit, and additional sums with the approval of the court. The court directed plaintiff's guardian to use the estate to handle all of plaintiff's other financial matters.

**4.** Title 42 U.S.C. § 1983 provides:
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any state or territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. For the purposes of this section, any act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

*Id.*
The Fourteenth Amendment, under which Congress enacted section 1983, includes a similar "state action" requirement. *See Monroe v. Pape*, 365 U.S. 167, 169–70, 81 S.Ct. 473, 474–75, 5 L.Ed.2d 492 (1961) (§ 1983 enacted pursuant to § 5 of the Fourteenth Amendment to enforce the provisions of the Fourteenth Amendment); *Krynicky v. University of Pittsburgh*, 742 F.2d 94, 97 (3d Cir.1984), *cert. denied*, 471 U.S. 1015, 105 S.Ct. 2018, 85 L.Ed.2d 300 (1985). Moreover, federal jurisprudence has long accepted the principle that the First Amendment guarantee of freedom of speech, invoked here by plaintiff, is among the liberties protected from state action by the due process clause of the Fourteenth Amendment. *See, e.g., Roth v. United States*, 354 U.S. 476, 479–80, 77 S.Ct. 1304, 1305–06, 1 L.Ed.2d 1498 (1957).

ly fall outside the coverage of § 1983. *See Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 349, 95 S.Ct. 449, 252, 42 L.Ed.2d 477 (1974) (private conduct, however wrongful, unprotected by Fourteenth Amendment). There are however, other considerations.

Action by a private party will satisfy the mandate of section 1983 if the deprivation of a federal right is "fairly attributable to the state". *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937, 102 S.Ct. 2744, 2753, 73 L.Ed.2d 482 (1982).

> First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible.... Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor. This may be because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State. Without a limit such as this, private parties could face constitutional litigation whenever they seek to rely on some state rule governing their interactions with the community surrounding them.

*Id.*

Both parties agree that *Lugar* is controlling on this issue.

Because the defendants invoked the state statutory provision granting a private right to seek imposition of a guardianship on plaintiff's estate, plaintiff meets the first prong of the *Lugar* test. *See* 20 Pa.Cons. Stat.Ann. § 5511 (grants private citizen power to petition state court to make competency determination and to appoint guardian of estate). Defendants contend however, that plaintiff fails the "state action" second prong because instituting state court proceedings and receiving the relief sought is insufficient to "alchemize" private conduct into state action under section 1983.

Plaintiff, meanwhile, reads *Lugar* as granting a cause of action under the Four-

teenth Amendment whenever a private party invokes a seemingly valid statute coupled with the aid of a state official. *Lugar, supra* at 933 n. 16, 102 S.Ct. at 2752 n. 16. Not only is this a misstatement of *Lugar*'s holding, *see Cruz v. Donnelly*, 727 F.2d 79, 81–82 (3d Cir.1984), but I find no case law to support such an expansive reading. To the contrary, nothing in *Lugar* indicates that a private party may invoke the jurisdiction of a federal court merely because a state judge, carrying out his constitutionally mandated duties, has applied a valid state law.

*Lugar* involved a prejudgment attachment statute that permitted the defendant to obtain an ex parte writ from the clerk of the state court and have the writ executed by a county sheriff. *Id.* at 924–25, 102 S.Ct. at 2746–47. In determining whether plaintiff had satisfied the state action requirement of the Fourteenth Amendment in his § 1983 lawsuit against the defendant oil company, the Supreme Court concluded that a private party who invoked the state's prejudgment attachment procedure acted jointly with the state. *Id.* at 942, 102 S.Ct. at 2756. As the court makes clear, the plaintiff in *Lugar* challenged the *procedures* followed by defendants in obtaining the prejudgment attachment. *Id.* at 940, 941, 102 S.Ct. at 2755 (emphasis added). In this action, Smith raises no such claim. Instead, plaintiff seeks to enjoin any further state court proceedings concerning the conservatorship of his estate and further seeks a declaration that section 5501(1), as applied to him, is unconstitutionally void for vagueness and overbreadth in violation of the First and Fourteenth Amendments. *See* Complaint at 14.

Plaintiff's reliance on footnote 16 of the *Lugar* opinion fails to persuade me that the Supreme Court intended its decision to extend beyond the context of prejudgment attachment proceedings. In fact, the Court's discussion in footnote 16 is merely dicta, responding to criticism in Justice Powell's dissent. *See Lugar, supra*, at 933 n. 16, 102 S.Ct. at 2752 n. 16. The Court did, in fact, refer to a "private decision to

invoke a presumptively valid state legal process." *Id.* Nevertheless, a careful reading of the footnote indicates that the Court explained that such conduct satisfies the state action requirement only in the context of a "valid prejudgment remedy statute." *Id.* Such situations arise only when a private individual acts jointly with the aid of a state official, such as a court clerk or a sheriff. *See id.*

My reading of *Lugar* is also supported by the context in which the Court discussed presumptively valid state law. All the cases cited in Justice White's majority discussion of this issue and Justice Powell's dissent involve attachment proceedings. *Compare id.* at 932–36, 102 S.Ct. at 2750–53 *with id.* at 952–54, 102 S.Ct. at 2761–62 (Powell, J. dissenting). More importantly however, the Court expressly limited its holding to the particular context of prejudgment attachment proceedings. *Id.* at 939 n. 21, 102 S.Ct. at 2755 n. 21, in which the court noted:

> [W]e do not hold today that "a private party's mere invocation of state legal procedures constitutes 'joint participation' or 'conspiracy' with state officials satisfying the § 1983 requirement of action under color of law." (citation omitted) The holding today, as the above analysis makes clear, is limited to the particular context of prejudgment attachment.

*Id. See also Cruz, supra,* at 81–82; *Cobb v. Georgia Power Co.,* 757 F.2d 1248, 1252 (11th Cir.1985) (*citing Earnest v. Lowentritt,* 690 F.2d 1198, 1201 (5th Cir.1982) (*Lugar* expressly limited to unconstitutional ex parte prejudgment attachment procedures)).

Only one court has seen fit to extend *Lugar* beyond the narrow context of ex parte prejudgment attachments, and in that case, the court confined its holding to an attachment pursuant to a court judgment. *Texaco, Inc. v. Penzoil Co.,* 784 F.2d 1133, 1146 (2d Cir.1986). Thus, even those federal courts that have elected to extend the *Lugar* holding, have deemed it necessary to limit their reading of *Lugar* to the con-

text of attachment action. Moreover, as in *Lugar,* the Second Circuit in *Texaco* confined its holding to the procedure set forth in state law. *Id.* at 1146.

Plaintiff's reliance on *Lugar* and its progeny is also misplaced because *Lugar*'s "joint action" test is inapplicable to cases in which a private party is alleged to be a state actor merely because it brought suit and invoked the independent judgment of the state judiciary. *Lugar* does not contain even a passing reference to the possibility that a neutral state judge could be considered a joint actor with a private party. I find no basis for this view, particularly where a state judge is legislatively mandated to make competency determinations. *See* 20 Pa.Cons.Stat.Ann. §§ 5501; 5511.

The Second Circuit in *Texaco, supra,* at 1146–47 also explored the aspect of judicial involvement. In *Texaco,* the plaintiff corporation maintained that the enforcement procedures as outlined in the state bond and lien statutes were unconstitutional as applied. *Id.* at 1147. The court found that state law directed state officials to do the "bidding" of a private party in executing a judgment. Therefore, the court determined, a private party, not the state judiciary, made the decision to utilize state agents to undertake the collection process. *Id.* As a result, the court in *Texaco* concluded, state officials were acting only upon a private party's unilateral determination. *Id.* at 1147 (*citing Lugar,* 457 U.S. at 941, 102 S.Ct. at 2755). *Accord Cruz, supra,* at 82.

This case is easily distinguishable. Here, no state officials are being called into action nor is the action taken against the plaintiff dependent on a unilateral determination by a private party. A state judge has merely determined that a state citizen is unable to manage his property based on the statutory mandate of the legislature. Section 5501 of the Pennsylvania statute does not require that only private parties may initiate an incompetency proceeding. The Pennsylvania statute permits both private and state initiated incompetency petitions. § 5511 (petition may be filed by any

person interested in alleged incompetent's welfare); *Matter of Caine,* 490 Pa. 24, 415 A.2d 13 (1980) (§ 5511 petition for a § 5501 competency determination filed by Commonwealth). Merely because a judicial determination was required does not bring plaintiff's case within the purview of either *Lugar* or the Second Circuit's extension of *Lugar* in *Texaco.*

The Second Circuit itself noted in *Texaco* the narrow context in which invocation of the state action nexus is permitted when a judicial determination is involved. *See Texaco, supra,* at 1147. The involvement of state agents in carrying out the lien and attachment procedures distinguished this case from those where a private individual seeks to obtain status as a state actor merely by bringing suit in seeking a judicial ruling. *Id.* at 1147. Here however, plaintiff's case falls within the context of a private party attempting to satisfy the state action requirement "merely because it used the state court legal process." *Cobb, supra,* at 1251 (*citing Dahl v. Akin,* 630 F.2d 277 (5th Cir.1980), *cert. denied,* 451 U.S. 908, 101 S.Ct. 1977, 68 L.Ed.2d 296 (1981)). *See also International Olympic Com. v. San Francisco Arts & Athletics,* 781 F.2d 733, 737 (9th Cir.1986) (judicial enforcement of private party's rights does not constitute sufficient state action under Fifth Amendment barring a government decision to violate rights).

In *Cobb,* the Eleventh Circuit determined that plaintiff failed to state a section 1983 claim simply by alleging that his employer had obtained a temporary restraining order from a state judge. *Cobb, supra,* at 1249, 1253. In examining the joint action nexus required under *Lugar,* the Eleventh Circuit noted that plaintiffs need "something more," such as bringing the state in as a fully culpable co-perpetrator, in order to transform a state court judgment into the type of joint action required under *Lugar. Cobb, supra,* at 1251.

Although the Third Circuit has not addressed the specific claim presented here, my holding is consistent with this Circuit's interpretation of *Lugar* and the prerequi-

site for a finding of joint state action. *See, e.g., Cruz, supra,* at 81–82; *Robb v. City of Philadelphia,* 733 F.2d 286 (3d Cir.1984). *See also Krynicky, supra,* at 103. Consistent with *Lugar*'s focus on the prejudgment attachment procedure, *Cruz, supra,* at 82, the state must have "established a formal procedure or working relationship that drapes private actors with the power of the state." *Robb, supra,* at 292 (quoting *Cruz, supra,* at 82).

Thus, a successful claim of "joint action" must be more than state officials acting at the request of private individuals. *See Cruz, supra,* at 82 (police acting on private request does not amount to state action). Liability of a private party under § 1983 must arise from government officials substituting "the judgment of private citizens for their own official authority." *Robb, supra,* at 292 (private citizens acting in concert with city officials drapes private actors with power of state for purposes of § 1983). It cannot be disputed that Judge Wood has not allowed the defendants to substitute their judgment for his own. Furthermore, he denied defendants' request to impose a § 5501(2) guardianship of the person on plaintiff.

My conclusion that plaintiff's claim fails to satisfy the *Lugar* "joint action" requirement is further buttressed by case law delineating the narrow context in which interaction between a private party and a judge can meet this standard. For example, in *Dennis v. Sparks,* 449 U.S. 24, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980), the Court observed that "merely resorting to the courts and being on the winning side of a lawsuit does not make a party a co-conspirator or a joint actor with a judge." *Id.* at 28, 101 S.Ct. at 186. If however, the official act of the defendant judge was the product of a corrupt conspiracy involving an incident such as bribery, the private party would be deemed to be acting under color of state law within the meaning of section 1983. *Id.* at 28–29, 101 S.Ct. at 186–87.

Plaintiff Smith has failed to allege any such conduct between Judge Wood and the

defendant family members. In fact, plaintiff acknowledges that both Judge Wood and the defendant family members acted in good faith. Similarly, plaintiff's complaint does not allege that an unconstitutional statute, regulation, or custom is being enforced by the state judge. *See, e.g., Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 29 L.Ed.2d 142 (1970).

I find that plaintiff in this case is merely dissatisfied with the result of the state court litigation and has failed to cite any defect in the procedure used to secure the result. Private litigants must set forth the manner in which a state law procedure is defective. *See Franco v. County of Marin,* 579 F.Supp. 1032, 1035 (N.D.Cal.1984), *aff'd,* 762 F.2d 1017 (9th Cir.1985).

Although determining whether particular conduct is private on one hand or state action on the other "frequently admits no easy answer," *Jackson, supra,* 419 U.S. at 350, 95 S.Ct. at 453 (*quoting Burton v. Wilmington Parking Authority,* 365 U.S. 715, 723, 81 S.Ct. 856, 860, 6 L.Ed.2d 45 (1961)), I am unable to find in the action involving the defendant family members and Judge Wood, "the symbiotic relationship" that accompanies a finding of state action. *Jackson, supra,* at 357, 95 S.Ct. at 456. Moreover, in adjudicating plaintiff's § 1983 claim, I am mindful of the admonition of *Lugar,* in which the Court observed that:

> Careful adherence to the 'state action' requirement preserves an area of individual freedom by limiting the reach of federal law and federal judicial power. It also avoids imposing on the State, its agencies or officials, responsibility for conduct for which they cannot fairly be blamed. A major consequence is to require the courts to respect the limits of their own power as directed against state governments and private interests. Whether this is a good or bad policy, it is a fundamental fact of our political order.

*Lugar,* 457 U.S. at 936–37, 102 S.Ct. at 2753.

Plaintiff's claim clearly poses the type of factual situation anticipated by the court in *Lugar.*

## II. *Judge Wood As a Party Defendant*

Having ruled that the defendant family members failed to satisfy the state actor requirement of § 1983, I now turn to Judge Wood's claim that he is an improper party to this suit. In his motion to dismiss, Judge Wood maintains that plaintiff has failed to allege a case or controversy against him sufficient to satisfy Article III of the Constitution. Specifically, Judge Wood contends that "a state court judge is not a proper party to a challenge to a state statute's constitutionality."

Plaintiff, meanwhile, alleges that Judge Wood is the most appropriate defendant because the judge has "effected the use and enforced the provisions of the statute." Plaintiff alleges that Judge Wood's role as enforcer of the challenged law and his continued activities regarding the conservatorship make the judge a proper party to this action.

In reviewing Judge Wood's motion to dismiss, I am mindful of *Pulliam v. Allen,* 466 U.S. 522, 104 S.Ct. 1970, 80 L.Ed.2d 565 (1984), which holds that judicial immunity is no bar to prospective injunctive relief against judges acting in their official capacity. *Id.,* 104 S.Ct. at 1981. Thus, in the proper circumstances, a state court judge may be the proper defendant in a § 1983 action. *See, e.g., Lynk v. LaPorte Superior Court No. 2,* 789 F.2d 554, 560, 569 (7th Cir.1986) (*Pulliam* permits suit against state judge for injunctive relief when judge has erected "seemingly arbitrary procedural obstacles" to prison inmate's divorce petition). This case however, does not fall within the type of case envisioned in *Pulliam.*

First, *Pulliam* involved a constitutional challenge to a state magistrate's *practice* of imposing bail on persons arrested for nonjailable offenses under state law and of incarcerating those persons who could not meet bail. *Id.,* 104 S.Ct. at 1972 (emphasis added). Second, *Pulliam* addressed wheth-

er Congress intended common law judicial immunity to insulate state judges from federal review for constitutional deprivations under § 1983. *Id.*, 104 S.Ct. at 1981. Neither the judicial practice issue nor the judicial immunity issue is raised here.

Plaintiff does not claim that Judge Wood has a practice of abridging constitutional rights in proceedings under section 5501. To the contrary, he seeks only to enjoin Judge Wood from applying a state law by alleging that it is facially defective. *Pulliam* cannot be extended to a case where a disappointed litigant attempts to enjoin the state court because of that court's ruling in an incompetency proceeding.

Nor does Judge Wood claim that he is immune from suit simply because he is a judge. Instead, he contends that no case or controversy exists between a neutral adjudicator of a private dispute and one of the litigants.

*Pulliam* itself recognizes the distinction between judicial immunity and the absence of an Article III "case or controversy." In discussing why judicial immunity is unnecessary in a § 1983 action, the court recognized the existing protection under Article III and the strict requirements for obtaining injunctive relief. Id., 104 S.Ct. at 1978–79 & n. 18. Thus, Article III is an inherent safeguard that curtails "the risk that judges will be harassed and their independence compromised by the threat of having to defend themselves against suits by disgruntled litigants." *See id.*

In reaching its conclusion that Article III limited injunctive relief against a judge, the Supreme Court cited with approval *In re Justices of the Supreme Court of Puerto Rico. See Pulliam, supra,* 104 S.Ct. at 1979 n. 18 (citing *In re Justices of The Supreme Court of Puerto Rico,* 695 F.2d 17, 21 (1st Cir.1982)). My review of *In re Justices* convinces me that the First Circuit's treatment of this issue is controlling here.

In *In re Justices,* five attorneys sued state justices and the state bar association, attacking the constitutionality of statutes requiring members of the bar to support the bar association through dues payments. 695 F.2d at 18–19. The justices argued, as does Judge Wood here, that the action presented no case or controversy, and that under Article III, plaintiff possessed no "adverse legal interest" in a case in which the justices "only function concerning the statutes being challenged is to act as neutral adjudicators rather than as administrators, enforcers or advocates." *Id.* at 21.

■ In concluding that the claim against the justices presented no case or controversy,[5] the First Circuit was guided by its finding that the justices were being sued in their capacity as "adjudicators," and not in their capacity as rule makers or administrators. *Id.* at 21. *See also Georgevich v. Strauss,* 772 F.2d 1078, 1087, 1088 (3d Cir. 1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1229, 89 L.Ed.2d 339 (1986). Plaintiff's claim here is raised in an identical context, and as a result, the rationale of *In re Justices* applies with equal force.

When asked to interpret § 5501 in plaintiff's case, Judge Wood sat in his role as an arbiter "without a personal or institutional stake on either side of the constitutional controversy." *In re Justices, supra,* at 21. He was sworn to uphold the Constitution of the United States, and simply because he denied plaintiff's First Amendment challenge, and imposed a conservatorship, does not create a dispute between Judge Wood and the plaintiff capable of judicial resolution. Under Article III, plaintiff's dispute with the judge fails to touch upon "the legal relations of parties having adverse legal interest." *Aetna Life Ins. Co. v. Hayworth,* 300 U.S. 227, 240–41, 57 S.Ct. 461, 463–64, 81 L.Ed. 617 (1937). Nor is plaintiff's action against Judge Wood likely to result in "self-interested parties vigorously advocating opposing positions." *United States Parole Commission v. Ger-*

---

**5.** Although the court determined that no Article III case or controversy existed, the court said it was reluctant to rely solely on Article III and therefore resolved the case on a nonconstitutional basis. *Id.* at 22.

*aghty,* 445 U.S. 388, 403, 100 S.Ct. 1202, 1212, 63 L.Ed.2d 479 (1980).

In this action, Judge Wood not only did not initiate the proceeding against plaintiff, but his only role in the action was that of a detached adjudicator, "finding facts and determining law in a neutral and impartial judicial fashion." *In re Justices, supra,* at 21. In this context, Judge Wood has no interest in upholding the Pennsylvania statute, nor is he in a position to debate plaintiff concerning the merits of the statute or the underlying intent that led to its enactment. Requiring Judge Wood to appear as a defendant in this action would require him to abandon his neutrality concerning the statute in question. *See id.* at 25.

Both the Third Circuit and the United States Supreme Court have relied on the distinction between a judge's role as an adjudicator and his role as a rule-maker or enforcer in assessing a judge's status as a party in a lawsuit. For example, in *Supreme Court of Virginia v. Consumers Union of America, Inc.,* 446 U.S. 719, 100 S.Ct. 1967, 64 L.Ed.2d 641 (1980), the Supreme Court distinguished between § 1983 suits against judges serving in their capacity as rule-makers as opposed to suits against judges in their role as adjudicators. *Id.* at 734–35, 100 S.Ct. at 1975–76. The Court found that the Virginia Supreme Court had promulgated the state bar code and possessed independent authority to initiate disciplinary proceedings against attorneys. Thus, the Court held, judges sued in their capacity as rule-makers and enforcement officers were properly sued as defendants. *Id.* at 736, 100 S.Ct. at 1976. *See also, Gras v. Stevens,* 415 F.Supp 1148, 1151 (S.D.N.Y.1976). Plaintiff states no such claim in this action. Instead, he claims that the subsequent Supreme Court ruling in *Pulliam* brings Judge Wood within the scope of this lawsuit. Aside from the fact that Judge Wood's actions are covered by the Article III doctrine set forth in *In re Justices* and recognized in *Pulliam,* the Third Circuit has provided substantial guidance on the interplay between Article III and *Pulliam.*

In *Georgevich v. Strauss, supra,* the Third Circuit recognized that no case or controversy existed in cases involving judges "sued in their judicial capacity as neutral adjudicators of disputes." *Georgevich, supra,* at 1087 (citing *In re Justices, supra,* 695 F.2d at 2125). In *Georgevich* however, the judges were being sued as enforcers of state parole statutes and as administrators of the state's parole power. *Georgevich, supra,* at 1087. Thus, *Pulliam* permitted plaintiffs to sue in an effort to have state court judges follow due process procedures concerning state parole matters. Since sentencing judges and the parole board shared statutory authority to make parole decisions, judges are proper parties if the case involves "statutes related to the judicial process or statutes previously enforced by a particular judge against the plaintiff." *Id.* at 1088 (citing *In re Justices, supra,* at 23). Here, plaintiff's claim raises neither scenario. Not only has plaintiff failed to attack the judicial procedure or practice, but Judge Wood did not enforce a statute "against" plaintiff.

Finally, I am not compelled to limit application of *In re Justices* to only those cases in which complete relief is possible by enjoining other nonjudicial parties with authority to grant relief. *See In re Justices, supra,* at 23. Although some courts have found this factor to be a consideration in granting the dismissal of a judicial party, none have labeled it a requirement. *See, e.g., R.W.T. v. Dalton,* 712 F.2d 1225, 1232–33 (8th Cir.1983), *cert. denied,* 464 U.S. 1009, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983); *Desrosiers v. In re Androscoggin County,* 611 F.Supp. 897, 898 (D.Maine 1985). *Cf. DiRuggiero v. Rodgers,* 743 F.2d 1009, 1021 (3d Cir.1984) (issue of injunctive remedy against state judges not reached because adequate remedies exist against private parties). More importantly, the presence or absence of other parties subject to an injunction is unrelated to my determination that no Article III case or controversy exists in this case. In fact, the First Circuit's reference to the possibility of enjoining other nonjudicial parties came in the

court's discussion of its nonconstitutional basis for its decision. *In re Justices, supra,* at 22–25.

### III. *Abstention*

Although I have dismissed plaintiff's claim against all defendants, I shall still discuss the abstention issue. I am, of course, aware that under *Railroad Comm'n. of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), abstention would not operate as a dismissal of plaintiff's claim in this court. Rather, *Pullman* abstention "involves postponing adjudication of a federal claim pending resolution of a possibly determinative state law issue." *Georgevich, supra,* at 1091 n. 15.

In requesting abstention from adjudicating plaintiff's claim, defendant family members urge that *Pullman* abstention is mandated because: (1) each of the issues presented for federal adjudication has been submitted to the state court; (2) federal adjudication of the claims would result in a "gratuitous interference" with ongoing state court proceedings; and (3) state court action will likely render this action moot, or at least present the issues in a different posture. Plaintiff argues that his case involves a "facial" and "as applied" First Amendment attack on the Pennsylvania statute as vague and overbroad,[6] thereby rendering abstention inappropriate. Plaintiff correctly points out that defendants have failed to rely on cases dealing with a conflict between abstention and a First Amendment challenge.

Although plaintiff's complaint clearly sets forth an "as applied" First Amendment challenge, *see e.g.,* ¶¶ 27, 28, 30, 33 and relief requested, ¶¶ 3 and 4, he now attempts in his brief to recast his allegations as a "facial" challenge. Although the type of plaintiff's challenge is important, I do not find it dispositive in this case.

Assuming no First Amendment challenge, "facial" or "as applied," *Pullman* abstention would be appropriate here. Plaintiff's challenge to section 5501 involves "an unsettled question of state law, the resolution of which would affect the decision of a federal constitutional issue, either by obviating the need to decide it or by changing the light in which it must be viewed." *Georgevich, supra,* at 1089 (quoting *Heritage Farms, Inc. v. Solebury Twp.,* 671 F.2d 743, 746 (3d Cir.), *cert. denied,* 456 U.S. 990, 102 S.Ct. 2270, 73 L.Ed.2d 1285 (1982). *See also Hawaii Housing Authority v. Midkiff,* 467 U.S. 229, 236–37, 104 S.Ct. 2321, 2326–27, 81 L.Ed.2d 186 (1984). Plaintiff seems to concede as much, emphasizing that the presence of a First Amendment challenge distinguishes his claim from factually similar cases in which courts had properly abstained. *See, e.g., Justice v. Superior Court,* 732 F.2d 949, 950 (D.C.Cir.) (affirming *Pullman* abstention despite a facial and as applied constitutional challenge to District of Columbia's conservatorship statute); *Kasap v. Moritz,* 613 F.2d 138 (6th Cir.1980) (affirming *Pullman* abstention in case involving litigation over Ohio's involuntary commitment procedures).

In *Justice,* the court noted that as long as an "as yet unconstrued" conservatorship statute is susceptible to a saving construction, plaintiff's facial and as applied constitutional attack falls "squarely within the scope of the *Pullman* abstention doctrine." *Justice, supra,* at 950. In reaching its holding, the court noted that plaintiff's had not pursued an appeal to the District of Columbia Court of Appeals for a number of years and as a result, the District of Co-

---

6. In a First Amendment vagueness challenge, a party claims that the statute "forbids or requires the doing of an action in terms so vague that men of common intelligence must necessarily gasp at its meaning and differ as to its application.... *Zwickler v. Koota,* 389 U.S. 241, 249, 88 S.Ct. 391, 396, 19 L.Ed.2d 444 (1967) (citations omitted). An overbreadth challenge, meanwhile, involves a claim that the statute offends the constitutional principle that 'a governmental purpose to control or prevent activities constitutionally subject to state regulation may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms.'" *Id.* at 250, 88 S.Ct. at 396. (citations omitted).

lumbia appellate court had not had an opportunity to resolve the dispute. *Id.*

Plaintiff, Smith, attempts to distinguish *Justice* on the grounds that the case did not involve a First Amendment challenge and that it was characterized by the "kind of exceptional circumstances, *e.g.*, forum shopping and failure to pursue claims, which support abstention." Plaintiff contends that these factors are absent here, but I cannot agree. In fact, plaintiff's complaint appears to be directed more at the result of Judge Wood's determination than with the constitutionality of the statute. Certainly this case, like *Justice*, involves a situation where Pennsylvania appellate courts may apply the saving construction to the unconstrued conservatorship statute. Although the reasoning of the court in *Justice* is persuasive, the importance of plaintiff's alleged First Amendment violations (¶ 29—violation of First Amendment right to free speech, to vote, to marry and to contract) mandate that I give his argument further consideration.

Plaintiff also appears to concede, albeit indirectly, that an "as applied" First Amendment challenge would be an appropriate case for abstention. In advocating his facial challenge, plaintiff maintains that a state court adjudication that the statute has been unconstitutionally applied to him would not eliminate the constitutional defect to all other residents of Pennsylvania. This argument acknowledges that the statute, as applied to plaintiff, but not on its face, is "obviously susceptible of a limiting construction," *Hawaii Housing Authority, supra,* 467 U.S. at 237, 104 S.Ct. at 2327 (quoting *Zwickler, supra,* 389 U.S. at 251 & n. 14, 88 S.Ct. at 397 & n. 14), and that a state appellate court interpretation of sec-

tion 5501 in plaintiff's favor would obviate the need for me to decide his "as applied" constitutional claim. Thus, a state court resolution of the proper interpretation of section 5501 would most likely resolve the apparent ambiguity alleged by plaintiff.[7] *See Procunier v. Martinez,* 416 U.S. 396, 401 & n. 5, 94 S.Ct. 1800, 1805 & n. 5, 40 L.Ed.2d 224 (1974) (citing *Baggett v. Bullit,* 377 U.S. 360, 376–77, 84 S.Ct. 1316, 1325–26, 12 L.Ed.2d 377 (1964) (abstention appropriate in "as applied" vagueness challenge to statutory loyalty oath requirement)).

■ Indeed, the Third Circuit, although in a non-First Amendment context, has recently stated that abstention might be more appropriate in cases involving an "as applied" statutory challenge than in cases involving a facial challenge. *Georgevich, supra,* at 1091–92. ("the reach of an uncertain state statute might ... be more susceptible of a limiting or clarifying construction"). Plaintiff, therefore, appears to rest his case on his facial First Amendment challenge. Even assuming that he has raised a facial challenge, which I find problematic, I find that this case would be a proper setting for abstention.

Although *Georgevich* involved an equal protection challenge, the Third Circuit, sitting *en banc,* accepted the proposition that abstention is appropriate in the context of a facial constitutional challenge. *See id.* at 1091, 1092 (both facial challenge and as applied challenge may be materially affected by state court resolution of state law issue). I am not persuaded however, that abstention should never apply in the context of a facial First Amendment challenge.

I recognize the reluctance to abstain in cases involving First Amendment chal-

---

7. Plaintiff himself has consistently contested the proper interpretations of terms such as "mental illness" and "designing person" in section 5501. For example, plaintiff contends:

> [T]he term "mental illness" cannot be permitted to be reduced to the far more amorphous "personality disorder". Nor can "liable ... to become the victim of designing persons ..." be equated with loaning (or giving) money, time or effort to a political cause, however unusual or "different" its views may be. Nor

can a declaration that an organization or person with particular political beliefs constitute a "designing" person within the meaning of a statute without violating the fundamental precepts of the First Amendment.

Complaint at ¶ 27.

Both parties agree that the interpretation of these phrases is a matter of first impression in Pennsylvania. I maintain that such interpretations are best left to state court judges.

lenges, largely because of the cost that plaintiffs may incur while their First Amendment claims are litigated in state court proceedings. *See, e.g., Zwickler, supra,* 389 U.S. at 252, 254, 88 S.Ct. at 397, 398 (abstention inappropriate in cases in which statutes justifiably attacked on their face as abridging free expression). *See also Procunier, supra,* 416 U.S. at 401 n. 5, 94 S.Ct. at 1805 n. 5 (abstention not required in context of facial First Amendment vagueness challenge); *New Jersey-Philadelphia, etc. v. New Jersey State Board,* 654 F.2d 868, 887 (3d Cir.1981) (*Pullman* considerations have little weight in First Amendment case at preliminary injunction stage). Nevertheless, the Supreme Court has never endorsed the proposition that the incantation of the words "facial First Amendment challenge" will always render *Pullman* abstention unwarranted. *See Brockett v. Spokane Arcades, Inc.,* 472 U.S. 491, 105 S.Ct. 2794, 2805, 86 L.Ed.2d 394 (1985) (O'Connor, J., concurring).

As recently as 1979, the Supreme Court required abstention in a case involving a facial First Amendment challenge. *Babbitt v. United Farm Workers National Union,* 442 U.S. 289, 306–13, 99 S.Ct. 2301, 2312–16, 60 L.Ed.2d 895 (1979). Despite a facial First Amendment freedom of association challenge, abstention was appropriate "where the challenged state statute is susceptible of a construction by the state judiciary that would avoid or modify the necessity of reaching a federal constitutional question." *Id.* at 306, 99 S.Ct. at 2312 (citations omitted).

Moreover, although a majority of the Supreme Court in *Brockett* disagreed with Justice O'Connor concerning the appropriateness of abstention, the facts in *Brockett* indicate the sensitive posture of that case. *Brockett,* the court observed, involved the risk of criminal conviction and civil penal-

ties under an obsenity statute. *Brockett, supra,* 105 S.Ct. at 2796. The court noted that the case involved the statute whose "very existence" has a chilling effect on protected expression. *Id.,* 105 S.Ct. at 2797. Here, the existence of Pennsylvania's conservatorship statute does not, by itself, have such a chilling effect. Plaintiff however, alleges that the statutory phrases "mental illness" "liable to become," and "the victim of designing persons" chill his First Amendment rights along with the First Amendment rights of all Pennsylvania citizens.

Yet the Pennsylvania statute does not regulate speech or any other First Amendment freedom. Rather, the challenged provisions deal with an individual's ability to manage his property, a determination peculiar to the role of a state court judge. In cases in which courts have denied abstention, the First Amendment attack was directed at state statutes whose very existence regulated free expression. *See, e.g., Brockett, supra,* 105 S.Ct. at 2796–97 (statute regulating obscene expression); *Zwickler, supra,* 389 U.S. at 242–43, 88 S.Ct. at 392 (statute regulating distribution and content of handbills); *Baggett, supra,* 377 U.S. at 361–62, 84 S.Ct. at 1317 (statute conditioning employment on loyalty oath). I find no similar statutory regulation of free expression inherent in Pennsylvania's conservatorship statute.

In addition, at this juncture, plaintiff is requesting a permanent injunction against the state court proceedings. *See* relief requested, ¶ 2. In support of his request for an injunction against Judge Wood's imposition of a conservatorship on his estate, plaintiff cites a Third Circuit case in which the court noted that *Pullman* considerations have little weight at the preliminary injunction stage. *See New Jersey-Philadelphia, etc., supra,* at 887.[8] A decision to

---

**8.** Plaintiff's requested relief also included a plea for a preliminary injunction. He sought to enjoin defendants from any further proceedings in the Pennsylvania state court concerning the guardianship of the estate and the guardianship of the person petition. Plaintiff however, re-

quested an opportunity to argue his exceptions to the adjudication of incompetency concerning the guardianship of the estate and ordering Judge Wood to rule on those exceptions so plaintiff could perfect his state court appellate rights. That request is now moot. Judge Wood

grant plaintiff's request for a permanent injunction against the ongoing state court proceedings would fly in the face of the purpose of the Pennsylvania statute. I would be required to allow plaintiff to spend all his money as he wishes, despite a state court finding of mental illness. This could result in plaintiff depleting the entirety of his 1.5 million dollar estate before *any* court adjudicates his First Amendment claim. I am not convinced that such relief is required, especially in light of the $5,000 monthly allowance that the state court has permitted plaintiff to spend without restraint.

Finally, and perhaps most important, application of § 5501 in plaintiff's case involves no fear of criminal prosecution. Virtually all courts declining abstention in the face of a First Amendment challenge have warned of the high cost of abstention and of the adverse chill on First Amendment rights. That chilling effect almost invariably results from the risk of criminal prosecution for engaging in the threatened activity. *See, e.g., Brockett, supra,* 105 S.Ct. at 2796 (comprehensive scheme of criminal and civil penalties for violation of obscenity statute); *Zwickler, supra,* 389 U.S. at 242, 88 S.Ct. at 392 (fear of criminal prosecution for violating handbill regulation); *Dombrowski v. Pfister,* 380 U.S. 479, 486, 85 S.Ct. 1116, 1120, 14 L.Ed.2d 22 (1965) (threat of criminal prosecution); *Baggett, supra,* 377 U.S. at 362–66, 84 S.Ct. at 1317–19 (penalty for perjury); *Davis v. Francois,* 395 F.2d 730–732 (5th Cir.1968) (risk of criminal conviction for picketing); *Lacey v. Borough of Darby,* 618 F.Supp. 331, 333 (E.D.Pa.1985) (threat of arrest for using sound equipment during political speech).

Plaintiff however, faces no similar threat. The statute has no provision for criminal or civil sanctions, and plaintiff's only disability stems from a state court determination, made after a hearing on the merits, in which he was deemed incompetent to manage his estate.

For the reasons stated above, I grant defendant family members' motion for failure to state a claim. I further dismiss Judge Wood from this lawsuit as an improper party because plaintiff has failed to allege an Article III case or controversy against the judge. I also note that had I found it necessary to do so, I could have properly abstained from deciding this case.

denied defendants' request for appointment of a guardianship of the person, and on July 23, 1986, Judge Wood dismissed plaintiff's exceptions to his *decree nisi* and entered a final order concerning his determination that a guardianship of plaintiff's estate was necessary. Therefore, ¶ 1 of plaintiff's requested relief (a preliminary injunction) is no longer an issue.