# HAWAII HOUSING AUTHORITY ET AL. *v.* MIDKIFF ET AL.

No. 83–141.   Argued March 26, 1984—Decided May 30, 1984*

---

*Together with No. 83–236, *Portlock Community Association (Maunalua Beach) et al.* v. *Midkiff et al.;* and No. 83–283, *Kahala Community Association, Inc., et al.* v. *Midkiff et al.*, also on appeal from the same court.

*Laurence H. Tribe,* Special Deputy Attorney General of Hawaii, argued the cause for appellants. With him on the briefs for appellants in Nos. 83–141 and 83–283 were *Kathleen M. Sullivan* and *David Rosenberg,* Special Deputy Attorneys General, *Tany S. Hong,* Attorney General, *Michael A. Lilly,* First Deputy Attorney General, *Dennis E. W. O'Connor, James H. Case,* and *A. Bernard Bays. Richard J. Archer* and *Corey Y. S. Park* filed briefs for appellants in No. 83–236.

*Clinton R. Ashford* argued the cause for appellees. With him on the brief were *E. Barrett Prettyman, Jr., B. Evan Bayh III, Rosemary T. Fazio, G. Richard Morry,* and *Earl T. Sato.*†

JUSTICE O'CONNOR delivered the opinion of the Court.

The Fifth Amendment of the United States Constitution provides, in pertinent part, that "private property [shall not] be taken for public use, without just compensation." These cases present the question whether the Public Use Clause of that Amendment, made applicable to the States through the Fourteenth Amendment, prohibits the State of Hawaii from taking, with just compensation, title in real property from

---

†Briefs of *amici curiae* urging affirmance were filed for the Office of Hawaiian Affairs by *H. K. Bruss Keppeler;* for the Pacific Legal Foundation by *Ronald A. Zumbrun* and *Harold J. Hughes;* and for the Queen Liliuokalani Trust et al. by *Daniel H. Case.*

*William A. Dobrovir* and *Joseph D. Gebhardt* filed a brief for the Hou Hawaiians et al. as *amici curiae.*

lessors and transferring it to lessees in order to reduce the concentration of ownership of fees simple in the State. We conclude that it does not.

I

A

The Hawaiian Islands were originally settled by Polynesian immigrants from the western Pacific. These settlers developed an economy around a feudal land tenure system in which one island high chief, the ali'i nui, controlled the land and assigned it for development to certain subchiefs. The subchiefs would then reassign the land to other lower ranking chiefs, who would administer the land and govern the farmers and other tenants working it. All land was held at the will of the ali'i nui and eventually had to be returned to his trust. There was no private ownership of land. See generally Brief for Office of Hawaiian Affairs as *Amicus Curiae* 3–5.

Beginning in the early 1800's, Hawaiian leaders and American settlers repeatedly attempted to divide the lands of the kingdom among the crown, the chiefs, and the common people. These efforts proved largely unsuccessful, however, and the land remained in the hands of a few. In the mid-1960's, after extensive hearings, the Hawaii Legislature discovered that, while the State and Federal Governments owned almost 49% of the State's land, another 47% was in the hands of only 72 private landowners. See Brief for the Hou Hawaiians and Maui Loa, Chief of the Hou Hawaiians, as *Amici Curiae* 32. The legislature further found that 18 landholders, with tracts of 21,000 acres or more, owned more than 40% of this land and that on Oahu, the most urbanized of the islands, 22 landowners owned 72.5% of the fee simple titles. *Id.*, at 32–33. The legislature concluded that concentrated land ownership was responsible for skewing the State's residential fee simple market, inflating land prices, and injuring the public tranquility and welfare.

To redress these problems, the legislature decided to compel the large landowners to break up their estates. The legislature considered requiring large landowners to sell lands which they were leasing to homeowners. However, the landowners strongly resisted this scheme, pointing out the significant federal tax liabilities they would incur. Indeed, the landowners claimed that the federal tax laws were the primary reason they previously had chosen to lease, and not sell, their lands. Therefore, to accommodate the needs of both lessors and lessees, the Hawaii Legislature enacted the Land Reform Act of 1967 (Act), Haw. Rev. Stat., ch. 516, which created a mechanism for condemning residential tracts and for transferring ownership of the condemned fees simple to existing lessees. By condemning the land in question, the Hawaii Legislature intended to make the land sales involuntary, thereby making the federal tax consequences less severe while still facilitating the redistribution of fees simple. See Brief for Appellants in Nos. 83–141 and 83–283, pp. 3–4, and nn. 6–8.

Under the Act's condemnation scheme, tenants living on single-family residential lots within developmental tracts at least five acres in size are entitled to ask the Hawaii Housing Authority (HHA) to condemn the property on which they live. Haw. Rev. Stat. §§ 516–1(2), (11), 516–22 (1977). When 25 eligible tenants,[1] or tenants on half the lots in the tract, whichever is less, file appropriate applications, the Act authorizes HHA to hold a public hearing to determine whether acquisition by the State of all or part of the tract will "effectuate the public purposes" of the Act. § 516–22. If HHA finds that these public purposes will be served, it is author-

---

[1] An eligible tenant is one who, among other things, owns a house on the lot, has a bona fide intent to live on the lot or be a resident of the State, shows proof of ability to pay for a fee interest in it, and does not own residential land elsewhere nearby. Haw. Rev. Stat. §§ 516–33(3), (4), (7) (1977).

ized to designate some or all of the lots in the tract for acquisition. It then acquires, at prices set either by condemnation trial or by negotiation between lessors and lessees,[2] the former fee owners' full "right, title, and interest" in the land. § 516–25.

After compensation has been set, HHA may sell the land titles to tenants who have applied for fee simple ownership. HHA is authorized to lend these tenants up to 90% of the purchase price, and it may condition final transfer on a right of first refusal for the first 10 years following sale. §§ 516–30, 516–34, 516–35. If HHA does not sell the lot to the tenant residing there, it may lease the lot or sell it to someone else, provided that public notice has been given. § 516–28. However, HHA may not sell to any one purchaser, or lease to any one tenant, more than one lot, and it may not operate for profit. §§ 516–28, 516–32. In practice, funds to satisfy the condemnation awards have been supplied entirely by lessees. See App. 164. While the Act authorizes HHA to issue bonds and appropriate funds for acquisition, no bonds have issued and HHA has not supplied any funds for condemned lots. See *ibid.*

## B

In April 1977, HHA held a public hearing concerning the proposed acquisition of some of appellees' lands. HHA made the statutorily required finding that acquisition of appellees' lands would effectuate the public purposes of the Act. Then, in October 1978, it directed appellees to negotiate with certain lessees concerning the sale of the designated properties. Those negotiations failed, and HHA subsequently ordered appellees to submit to compulsory arbitration.

Rather than comply with the compulsory arbitration order, appellees filed suit, in February 1979, in United States Dis-

---

[2] See § 516–56 (Supp. 1983). In either case, compensation must equal the fair market value of the owner's leased fee interest. § 516–1(14). The adequacy of compensation is not before us.

trict Court, asking that the Act be declared unconstitutional and that its enforcement be enjoined. The District Court temporarily restrained the State from proceeding against appellees' estates. Three months later, while declaring the compulsory arbitration and compensation formulae provisions of the Act unconstitutional,[3] the District Court refused preliminarily to enjoin appellants from conducting the statutory designation and condemnation proceedings. Finally, in December 1979, it granted partial summary judgment to appellants, holding the remaining portion of the Act constitutional under the Public Use Clause. See 483 F. Supp. 62 (Haw. 1979). The District Court found that the Act's goals were within the bounds of the State's police powers and that the means the legislature had chosen to serve those goals were not arbitrary, capricious, or selected in bad faith.

The Court of Appeals for the Ninth Circuit reversed. 702 F. 2d 788 (1983). First, the Court of Appeals decided that the District Court had permissibly chosen not to abstain from the exercise of its jurisdiction. Then, the Court of Appeals determined that the Act could not pass the requisite judicial scrutiny of the Public Use Clause. It found that the transfers contemplated by the Act were unlike those of takings previously held to constitute "public uses" by this Court. The court further determined that the public purposes offered by the Hawaii Legislature were not deserving of judicial deference. The court concluded that the Act was simply "a naked attempt on the part of the state of Hawaii to take the private property of A and transfer it to B solely for B's private use and benefit." *Id.*, at 798. One judge dissented.

---

[3] As originally enacted, lessor and lessee had to commence compulsory arbitration if they could not agree on a price for the fee simple title. Statutory formulae were provided for the determination of compensation. The District Court declared both the compulsory arbitration provision and the compensation formulae unconstitutional. No appeal was taken from these rulings, and the Hawaii Legislature subsequently amended the statute to provide only for mandatory negotiation and for advisory compensation formulae. These issues are not before us.

On applications of HHA and certain private appellants who had intervened below, this Court noted probable jurisdiction. 464 U. S. 932 (1983). We now reverse.

## II

We begin with the question whether the District Court abused its discretion in not abstaining from the exercise of its jurisdiction. The appellants have suggested as one alternative that perhaps abstention was required under the standards announced in *Railroad Comm'n* v. *Pullman Co.*, 312 U. S. 496 (1941), and *Younger* v. *Harris*, 401 U. S. 37 (1971). We do not believe that abstention was required.

## A

In *Railroad Comm'n* v. *Pullman Co.*, *supra*, this Court held that federal courts should abstain from decision when difficult and unsettled questions of state law must be resolved before a substantial federal constitutional question can be decided. By abstaining in such cases, federal courts will avoid both unnecessary adjudication of federal questions and "needless friction with state policies . . . ." *Id.*, at 500. However, federal courts need not abstain on *Pullman* grounds when a state statute is not "fairly subject to an interpretation which will render unnecessary" adjudication of the federal constitutional question. See *Harman* v. *Forssenius*, 380 U. S. 528, 535 (1965). *Pullman* abstention is limited to uncertain questions of state law because "[a]bstention from the exercise of federal jurisdiction is the exception, not the rule." *Colorado River Water Conservation Dist.* v. *United States*, 424 U. S. 800, 813 (1976).

In these cases, there is no uncertain question of state law. The Act unambiguously provides that "[t]he use of the power . . . to condemn . . . is for a public use and purpose." Haw. Rev. Stat. § 516–83(a)(12) (1977); see also §§ 516–83(a)(10), (11), (13). There is no other provision of the Act—or, for that matter, of Hawaii law—which would suggest that

§ 516–83(a)(12) does not mean exactly what it says.   Since "the naked question, uncomplicated by [ambiguous language], is whether the Act on its face is unconstitutional," *Wisconsin* v. *Constantineau*, 400 U. S. 433, 439 (1971), abstention from federal jurisdiction is not required.

The dissenting judge in the Court of Appeals suggested that, perhaps, the state courts could make resolution of the federal constitutional questions unnecessary by their construction of the Act.   See 702 F. 2d, at 811–812.   In the abstract, of course, such possibilities always exist.   But the relevant inquiry is not whether there is a bare, though unlikely, possibility that state courts *might* render adjudication of the federal question unnecessary.   Rather, "[w]e have frequently emphasized that abstention is not to be ordered unless the statute is of an uncertain nature, and is obviously susceptible of a limiting construction."   *Zwickler* v. *Koota*, 389 U. S. 241, 251, and n. 14 (1967).   These statutes are not of an uncertain nature and have no reasonable limiting construction.   Therefore, *Pullman* abstention is unnecessary.[4]

## B

The dissenting judge also suggested that abstention was required under the standards articulated in *Younger* v. *Harris, supra*.   Under *Younger*-abstention doctrine, interests of comity and federalism counsel federal courts to abstain from jurisdiction whenever federal claims have been or could be presented in ongoing state judicial proceedings that concern

---

[4] The dissenting judge's suggestion that *Pullman* abstention was required because interpretation of the State Constitution may have obviated resolution of the federal constitutional question is equally faulty.   Hawaii's Constitution has only a parallel requirement that a taking be for a public use.   See Haw. Const., Art. I, § 20.   The Court has previously determined that abstention is not required for interpretation of parallel state constitutional provisions.   See *Examining Board* v. *Flores de Otero*, 426 U. S. 572, 598 (1976); see also *Wisconsin* v. *Constantineau*, 400 U. S. 433 (1971).

important state interests.  See *Middlesex Ethics Committee v. Garden State Bar Assn.*, 457 U. S. 423, 432–437 (1982). *Younger* abstention is required, however, only when state court proceedings are initiated "before any proceedings of substance on the merits have taken place in the federal court." *Hicks* v. *Miranda*, 422 U. S. 332, 349 (1975).  In other cases, federal courts must normally fulfill their duty to adjudicate federal questions properly brought before them.

In these cases, state judicial proceedings had not been initiated at the time proceedings of substance took place in federal court.  Appellees filed their federal court complaint in February 1979, asking for temporary and permanent relief.  The District Court temporarily restrained HHA from proceeding against appellees' estates.  At that time, no state judicial proceedings were in process.  Indeed, in June 1979, when the District Court granted, in part, appellees' motion for a preliminary injunction, state court proceedings still had not been initiated.  Rather, HHA filed its first eminent domain lawsuit *after* the parties had begun filing motions for summary judgment in the District Court—in September 1979.  Whether issuance of the February temporary restraining order was a substantial federal court action or not, issuance of the June preliminary injunction certainly was. See *Doran* v. *Salem Inn, Inc.*, 422 U. S. 922, 929–931 (1975). A federal court action in which a preliminary injunction is granted has proceeded well beyond the "embryonic stage," *id.*, at 929, and considerations of economy, equity, and federalism counsel against *Younger* abstention at that point.

The only extant proceedings at the state level prior to the September 1979 eminent domain lawsuit in state court were HHA's administrative hearings.  But the Act clearly states that these administrative proceedings are not part of, and are not themselves, a judicial proceeding, for "mandatory arbitration shall be in advance of and shall not constitute any part of any action in condemnation or eminent domain." Haw. Rev. Stat. § 516–51(b) (1976).  Since *Younger* is not a

bar to federal court action when state judicial proceedings have not themselves commenced, see *Middlesex County Ethics Committee* v. *Garden State Bar Assn.*, *supra*, at 433; *Fair Assessment in Real Estate Assn., Inc.* v. *McNary*, 454 U. S. 100, 112–113 (1981), abstention for HHA's administrative proceedings was not required.

## III

The majority of the Court of Appeals next determined that the Act violates the "public use" requirement of the Fifth and Fourteenth Amendments. On this argument, however, we find ourselves in agreement with the dissenting judge in the Court of Appeals.

## A

The starting point for our analysis of the Act's constitutionality is the Court's decision in *Berman* v. *Parker*, 348 U. S. 26 (1954). In *Berman*, the Court held constitutional the District of Columbia Redevelopment Act of 1945. That Act provided both for the comprehensive use of the eminent domain power to redevelop slum areas and for the possible sale or lease of the condemned lands to private interests. In discussing whether the takings authorized by that Act were for a "public use," *id.*, at 31, the Court stated:

> "We deal, in other words, with what traditionally has been known as the police power. An attempt to define its reach or trace its outer limits is fruitless, for each case must turn on its own facts. The definition is essentially the product of legislative determinations addressed to the purposes of government, purposes neither abstractly nor historically capable of complete definition. Subject to specific constitutional limitations, when the legislature has spoken, the public interest has been declared in terms well-nigh conclusive. In such cases the legislature, not the judiciary, is the main guardian of the public needs to be served by social legislation, whether it

be Congress legislating concerning the District of Columbia . . . or the States legislating concerning local affairs. . . . This principle admits of no exception merely because the power of eminent domain is involved. . . ." *Id.*, at 32 (citations omitted).

The Court explicitly recognized the breadth of the principle it was announcing, noting:

"Once the object is within the authority of Congress, the right to realize it through the exercise of eminent domain is clear. For the power of eminent domain is merely the means to the end. . . . Once the object is within the authority of Congress, the means by which it will be attained is also for Congress to determine. Here one of the means chosen is the use of private enterprise for redevelopment of the area. Appellants argue that this makes the project a taking from one businessman for the benefit of another businessman. But the means of executing the project are for Congress and Congress alone to determine, once the public purpose has been established." *Id.*, at 33.

The "public use" requirement is thus coterminous with the scope of a sovereign's police powers.

There is, of course, a role for courts to play in reviewing a legislature's judgment of what constitutes a public use, even when the eminent domain power is equated with the police power. But the Court in *Berman* made clear that it is "an extremely narrow" one. *Id.*, at 32. The Court in *Berman* cited with approval the Court's decision in *Old Dominion Co.* v. *United States*, 269 U. S. 55, 66 (1925), which held that deference to the legislature's "public use" determination is required "until it is shown to involve an impossibility." The *Berman* Court also cited to *United States ex rel. TVA* v. *Welch*, 327 U. S. 546, 552 (1946), which emphasized that "[a]ny departure from this judicial restraint would result in courts deciding on what is and is not a governmental function and in their invalidating legislation on the basis of their view

on that question at the moment of decision, a practice which has proved impracticable in other fields." In short, the Court has made clear that it will not substitute its judgment for a legislature's judgment as to what constitutes a public use "unless the use be palpably without reasonable foundation." *United States* v. *Gettysburg Electric R. Co.*, 160 U. S. 668, 680 (1896).

To be sure, the Court's cases have repeatedly stated that "one person's property may not be taken for the benefit of another private person without a justifying public purpose, even though compensation be paid." *Thompson* v. *Consolidated Gas Corp.*, 300 U. S. 55, 80 (1937). See, *e. g.*, *Cincinnati* v. *Vester*, 281 U. S. 439, 447 (1930); *Madisonville Traction Co.* v. *St. Bernard Mining Co.*, 196 U. S. 239, 251–252 (1905); *Fallbrook Irrigation District* v. *Bradley*, 164 U. S. 112, 159 (1896). Thus, in *Missouri Pacific R. Co.* v. *Nebraska*, 164 U. S. 403 (1896), where the "order in question was not, *and was not claimed to be,* . . . a taking of private property for a public use under the right of eminent domain," *id.*, at 416 (emphasis added), the Court invalidated a compensated taking of property for lack of a justifying public purpose. But where the exercise of the eminent domain power is rationally related to a conceivable public purpose, the Court has never held a compensated taking to be proscribed by the Public Use Clause. See *Berman* v. *Parker, supra; Rindge Co.* v. *Los Angeles*, 262 U. S. 700 (1923); *Block* v. *Hirsh*, 256 U. S. 135 (1921); cf. *Thompson* v. *Consolidated Gas Corp., supra* (invalidating an *uncompensated* taking).

On this basis, we have no trouble concluding that the Hawaii Act is constitutional. The people of Hawaii have attempted, much as the settlers of the original 13 Colonies did,[5] to reduce the perceived social and economic evils of a

---

[5] After the American Revolution, the colonists in several States took steps to eradicate the feudal incidents with which large proprietors had encumbered land in the Colonies. See, *e. g.*, Act of May 1779, 10 Henning's Statutes At Large 64, ch. 13, § 6 (1822) (Virginia statute); Divesting Act of

land oligopoly traceable to their monarchs. The land oligopoly has, according to the Hawaii Legislature, created artificial deterrents to the normal functioning of the State's residential land market and forced thousands of individual homeowners to lease, rather than buy, the land underneath their homes. Regulating oligopoly and the evils associated with it is a classic exercise of a State's police powers. See *Exxon Corp.* v. *Governor of Maryland*, 437 U. S. 117 (1978); *Block* v. *Hirsh, supra;* see also *People of Puerto Rico* v. *Eastern Sugar Associates*, 156 F. 2d 316 (CA1), cert. denied, 329 U. S. 772 (1946). We cannot disapprove of Hawaii's exercise of this power.

Nor can we condemn as irrational the Act's approach to correcting the land oligopoly problem. The Act presumes that when a sufficiently large number of persons declare that they are willing but unable to buy lots at fair prices the land market is malfunctioning. When such a malfunction is signalled, the Act authorizes HHA to condemn lots in the relevant tract. The Act limits the number of lots any one tenant can purchase and authorizes HHA to use public funds to ensure that the market dilution goals will be achieved. This is a comprehensive and rational approach to identifying and correcting market failure.

Of course, this Act, like any other, may not be successful in achieving its intended goals. But "whether *in fact* the provision will accomplish its objectives is not the question: the [constitutional requirement] is satisfied if . . . the . . . [state] Legislature *rationally could have believed* that the [Act] would promote its objective." *Western & Southern Life Ins. Co.* v. *State Bd. of Equalization*, 451 U. S. 648, 671–672 (1981); see also *Minnesota* v. *Clover Leaf Creamery Co.*, 449 U. S. 456, 466 (1981); *Vance* v. *Bradley*, 440 U. S. 93, 112 (1979). When the legislature's purpose is legitimate and its

---

1779, 1775–1781 Pa. Acts 258, ch. 139 (1782) (Pennsylvania statute). Courts have never doubted that such statutes served a public purpose. See, *e. g., Wilson* v. *Iseminger*, 185 U. S. 55, 60–61 (1902); *Stewart* v. *Gorter*, 70 Md. 242, 244–245, 16 A. 644, 645 (1889).

means are not irrational, our cases make clear that empirical debates over the wisdom of takings—no less than debates over the wisdom of other kinds of socioeconomic legislation—are not to be carried out in the federal courts. Redistribution of fees simple to correct deficiencies in the market determined by the state legislature to be attributable to land oligopoly is a rational exercise of the eminent domain power. Therefore, the Hawaii statute must pass the scrutiny of the Public Use Clause.[6]

## B

The Court of Appeals read our cases to stand for a much narrower proposition. First, it read our "public use" cases, especially *Berman*, as requiring that government possess and use property at some point during a taking. Since Hawaiian lessees retain possession of the property for private use throughout the condemnation process, the court found that the Act exacted takings for private use. 702 F. 2d, at 796–797. Second, it determined that these cases involved only "the review of . . . *congressional* determination[s] that there was a public use, *not* the review of . . . state legislative determination[s]." *Id.*, at 798 (emphasis in original). Because state legislative determinations are involved in the instant cases, the Court of Appeals decided that more rigorous judicial scrutiny of the public use determinations was appropriate. The court concluded that the Hawaii Legislature's professed purposes were mere "statutory rationalizations." *Ibid.* We disagree with the Court of Appeals' analysis.

The mere fact that property taken outright by eminent domain is transferred in the first instance to private beneficiaries does not condemn that taking as having only a private

---

[6] We similarly find no merit in appellees' Due Process and Contract Clause arguments. The argument that due process prohibits allowing lessees to initiate the taking process was essentially rejected by this Court in *New Motor Vehicle Board* v. *Fox Co.*, 439 U. S. 96, 108–109 (1978). Similarly, the Contract Clause has never been thought to protect against the exercise of the power of eminent domain. See *United States Trust Co.* v. *New Jersey*, 431 U. S. 1, 19, and n. 16 (1977).

purpose. The Court long ago rejected any literal requirement that condemned property be put into use for the general public. "It is not essential that the entire community, nor even any considerable portion, . . . directly enjoy or participate in any improvement in order [for it] to constitute a public use." *Rindge Co.* v. *Los Angeles,* 262 U. S., at 707. "[W]hat in its immediate aspect [is] only a private transaction may . . . be raised by its class or character to a public affair." *Block* v. *Hirsh,* 256 U. S., at 155. As the unique way titles were held in Hawaii skewed the land market, exercise of the power of eminent domain was justified. The Act advances its purposes without the State's taking actual possession of the land. In such cases, government does not itself have to use property to legitimate the taking; it is only the taking's purpose, and not its mechanics, that must pass scrutiny under the Public Use Clause.

Similarly, the fact that a state legislature, and not the Congress, made the public use determination does not mean that judicial deference is less appropriate.[7] Judicial deference is required because, in our system of government, legislatures are better able to assess what public purposes should be advanced by an exercise of the taking power. State legislatures are as capable as Congress of making such determinations within their respective spheres of authority. See *Berman* v. *Parker,* 348 U. S., at 32. Thus, if a legislature, state or federal, determines there are substantial reasons for an exercise of the taking power, courts must defer to its determination that the taking will serve a public use.

---

[7] It is worth noting that the Fourteenth Amendment does not itself contain an independent "public use" requirement. Rather, that requirement is made binding on the States only by incorporation of the Fifth Amendment's Eminent Domain Clause through the Fourteenth Amendment's Due Process Clause. See *Chicago, B. & Q. R. Co.* v. *Chicago,* 166 U. S. 226 (1897). It would be ironic to find that state legislation is subject to greater scrutiny under the incorporated "public use" requirement than is congressional legislation under the express mandate of the Fifth Amendment.

## IV

The State of Hawaii has never denied that the Constitution forbids even a compensated taking of property when executed for no reason other than to confer a private benefit on a particular private party. A purely private taking could not withstand the scrutiny of the public use requirement; it would serve no legitimate purpose of government and would thus be void. But no purely private taking is involved in these cases. The Hawaii Legislature enacted its Land Reform Act not to benefit a particular class of identifiable individuals but to attack certain perceived evils of concentrated property ownership in Hawaii—a legitimate public purpose. Use of the condemnation power to achieve this purpose is not irrational. Since we assume for purposes of these appeals that the weighty demand of just compensation has been met, the requirements of the Fifth and Fourteenth Amendments have been satisfied. Accordingly, we reverse the judgment of the Court of Appeals, and remand these cases for further proceedings in conformity with this opinion.

*It is so ordered.*

JUSTICE MARSHALL took no part in the consideration or decision of these cases.