JAMES N. ANTHONY and ALBERTA PUA ANTHONY, Plaintiffs-Appellees, *v.* KUALOA RANCH, INC., a Hawaii corporation, and FRANCIS MORGAN, Defendants-Appellants

NO. 11424

(CIVIL NO. 78658)

APRIL 23, 1987

LUM, C.J., NAKAMURA, PADGETT, HAYASHI AND WAKATSUKI, JJ.

OPINION OF THE COURT BY PADGETT, J.

This is an appeal from an order staying judgment pending arbitration. We reverse.

In 1953, appellants leased lot 55A of the Kaaawa Beach lots for residential purposes to Albert F. Biehl and Josephine H. Biehl at a rental of $75 per annum for a term of 30 years. The present appellees acquired the leasehold through mesne assignments, consented to by the appellants, in 1976. The lease contained the following provisions, *inter alia:*

> THAT the Lessee will not erect or permit to be erected upon the demised premises any new buildings or to make or permit to be made any addition to any buildings which may at present exist or shall at any time during the said term be erected

upon the land hereby demised, except in accordance with plans and specifications previously approved by the Lessor;

. . . .

THAT on the last day of the term hereby demised or on any sooner termination thereof, the Lessee will peaceably and quietly yield and deliver up to the Lessor possession of the demised premises; PROVIDED, HOWEVER, that the Lessee, if he shall have observed and performed all of the covenants and conditions herein contained and on his part to be observed and performed, after giving written notice of his intention to the Lessor, shall have the privilege of removing any building or buildings which have been placed on the demised premises at his own expense, and if he shall remove the building or buildings, he shall clear the premises of all rubbish and debris and restore the surface to a condition satisfactory to the Lessor within such reasonable period as the Lessor shall prescribe[.]

Appellees, after taking over the lease, erected substantial additions to the residence on the premises. After the expiration of the lease on July 1, 1983, appellees filed suit for specific performance of an alleged agreement to enter into a new lease, and for damages for unfair and deceptive trade practices, and retaliatory acts. As an alternative to their prayer for specific performance of the alleged agreement for a new lease, they prayed that the appellants be ordered to buy from them the residential improvements existing on the premises under the provisions of HRS § 516-70. Appellants counterclaimed for a declaration that the lease had terminated and for ejectment.

The case was tried before a jury which answered 17 special interrogatories. Thereafter, on March 6, 1986, the trial court entered its findings of fact, conclusions of law, and order. In that document, the court rejected appellees' claims for specific performance, and damages for unfair and deceptive trade practices and retaliatory acts; upheld appellants' claims of lease termination and for ejectment; ordered appellees to pay rental at the rate of $212 per month from July 2, 1983 to the time of ejectment; ordered appellants to pay appellees the fair market value of the leasehold improvements as of the date of the expiration of the lease; ordered the parties to mutually agree on the value of such improvements,

and failing such agreement, to proceed to appraisal or arbitration of the fair market value of the leasehold improvements pursuant to HRS Chapter 658.

The parties did not agree on the value of the leasehold improvements and subsequently on May 5, 1986, the court entered its "Order Staying Judgment Pending Arbitration" from which this appeal is taken.

Appellees contend that the May 5 order does not have sufficient finality to make it appealable and, alternatively, that if it does have sufficient finality, the same was true of the March 6 order, and that therefore this appeal is taken too late. Appellants contend that the effective order was not that of March 6 but that of May 5, the stay, and that, under *Association of Owners of Kukui Plaza v. Swinerton & Walberg Co.*, 68 Haw. 98, 705 P.2d 28 (1985), which overruled *Pfaeltzer v. Patterson*, 49 Haw. 59, 410 P.2d 974 (1966), the latter order is appealable.

HRS Chapter 658 applies to agreements, in written contracts, to settle controversies by arbitration, and to agreements, in writing, to submit existing controversies to arbitration. Such was the case in *Swinerton,* such was the case in *Pfaeltzer.* Here, however, we are dealing with a statutory requirement of arbitration.

HRS § 516-70, when originally enacted as § 43 of Act 307 of the Session Laws of 1967, merely provided:

At the termination of any lease, or at the expiration of the lease term, the lessee may remove all improvements on the lot which were constructed at the cost of, or otherwise paid for by the lessee, without compensating the lessor therefor.

That provision was not different, in substance, from the lease.

However, § 19 of Act 184 of the Session Laws of 1975 amended the statute to its present form, so that it now reads:

*Reversion of improvements.* (a) This section applies to all leases of residential lands as defined by section 516-1(5).

(b) At the termination of any lease, or at the expiration of the lease term, the lessee may, if not then in default under the terms of the lessee's lease, remove all onsite improvements on the lot which were constructed at the cost of, or otherwise paid for by, the lessee, without compensating the lessor therefor. If the lessee notifies the lessor in writing within sixty days before the termination or expiration that the lessee declines to remove

such onsite improvements and if the lessee is not then in default under the terms of the lessee's lease, and if the lessor refuses to extend the term of the existing lease or to issue a new lease for a term of at least thirty years at a rental that is mutually agreeable to the parties or failing such agreement that is determined by arbitration pursuant to chapter 658, the lessor shall be required to compensate the lessee for the current fair market value of all such onsite improvements. Such improvements shall be appraised at the expense of the lessee. The appraiser selected shall be by mutual agreement of the lessee and the lessor or in conformance to chapter 658. The compensation shall be determined by mutual agreement or in conformity with chapter 658, and the compensation shall be paid within thirty days of determination. Such expense of arbitration shall be equally shared by both parties.

Because the requirement for arbitration was statutory, not contractual, *Swinerton* is inapposite.

We reject appellees' argument that the March 6 order had any finality to it. We read it to be interlocutory only. On the other hand, the May 5 order staying the judgment pending arbitration did have aspects of finality. It appointed an appraiser; it ordered the appraiser to report within 45 days from the date of the order; it provided for a judgment directing the appellants to pay appellees the current fair market value of the improvements determined by the appraiser, less the amounts owed by the appellees to the appellants for damages, etc., within 30 days after the determination; it stayed appellants' right to regain possession of their land by way of a writ of possession until such payment was made; and it provided that if the appellees deposited certain monies with the clerk by May 6, 1986 judgment would be stayed pending arbitration; but that if they did not, judgment would be entered for appellants with a further judgment to be entered for appellees on the conclusion of the arbitration.

Appellees' counsel, at oral argument, stated that the fair market value of the leasehold improvements which, under the statute, appellants must pay to the appellees (since appellees chose not to remove their improvements) was between $100,000 and $140,000. If the arbitration had taken place as ordered, and that statement had turned out to be correct, then obviously the appellants would

have been required to pay to the appellees, within 105 days from May 6, 1986, a sum near, or perhaps well in excess of, $100,000, before they could regain possession of their property, even though the court had found that the lease had been terminated, and that they were entitled to such possession.

Due to the peculiarity of the litigation, and of the order in question, it is unlikely that a similar case will recur. Certainly, had the parties proceeded to arbitration and the court made its decree with respect to the amount to be paid by appellants to appellees for the improvements within the 75 days envisioned by the order, there would be no question but that appellants, faced with the requirement of payment within 30 days after that decree, as required by HRS § 516-70, would have had a right to appeal. See *Forgay v. Conrad,* 47 U.S. (6 How.) 201 (1848). See also *MDG Supply, Inc. v. Diversified Investments, Inc.,* 51 Haw. 375, 463 P.2d 425 (1969), *reh. denied* 51 Haw. 479, 463 P.2d 525 (1969), *cert. denied* 400 U.S. 868 (1970).

The question then becomes one of whether, given appellees' assertion as to the value of the improvements, we should require the parties to go through the arbitration, and the court below to enter its decree confirming the same, before entertaining this appeal. Since the order in question expressly assumes that, as a result of the arbitration, some net monies will have to be paid by the appellants to the appellees, prior to obtaining the relief of possession, and locks the parties into a position where, so long as the appellants do not pay those monies, they cannot regain possession of their premises, and since, if the lessors do not pay within 30 days of the judgment, they would be subject to criminal penalties under HRS § 516-5, we conclude there is sufficient finality, in fact, in the order, to give us jurisdiction of this appeal.

Appellants raise two constitutional objections to the application of the provisions of HRS § 516-70 to this case. They contend first that the statute in question violates Section 10 of Article I of the Constitution of the United States which provides in part: "No State shall . . . pass any . . . Law impairing the Obligation of Contracts[.]" Secondly, they contend that the compulsory arbitration provisions of HRS § 516-70 violate their right to a jury trial under the Constitutions of the United States and the State of Hawaii. We reach only the first contention.

The 30-year lease with which we are here dealing was entered into in September 1953 as of July 1, 1953. It contains an express agreement allowing the lessees, if not in default under the lease, to remove, at their expense, after giving written notice thereof to the lessors, the building or buildings which have been placed on the premises. This provision substantially parallels the statutory provision enacted in 1967 as a part of the leasehold conversion act.

In 1975, however, the statutory section in question was changed to its present form. It applies to all residential leases, and not just to those residential leases of lands in tracts, which are subject to condemnation by eminent domain under the other provisions of HRS Chapter 516. Lessors who, before 1975, owned and leased a single lot are just as much bound by HRS § 516-70's provisions as the largest estate. The section in question, by its terms, will compel each lessor, upon termination of a lease, if the lessee elects not to remove the residential leasehold improvements, to pay the lessee the "fair market value" of that lessee's improvements (whatever that may mean in this context). It will, however, have no effect in breaking up the oligopolistic landownership, and the inequality of bargaining power resulting therefrom, which was the objective of the Hawaii leasehold conversion act, and which was the basis for upholding that act as a legitimate exercise of the power of eminent domain under the federal and state constitutions. *Hawaii Housing Authority v. Midkiff*, 467 U.S. 229, 81 L.Ed.2d 186, 104 S.Ct. 2321 (1984); *Hawaii Housing Authority v. Lyman*, 68 Haw. 55, 704 P.2d 888 (1985). The section in question is not an exercise of the State's right to take private property for public use. On the contrary, it is a provision compelling private landowners to pay lessees, solely at lessees' option, for improvements they may not want, may not be able to use, and may not be able to afford.

The parties have cited to us four cases of relatively recent vintage, decided by the Supreme Court of the United States, dealing with the contracts clause. They are *United States Trust Co. of New York v. New Jersey*, 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977); *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978); *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983); and *Exxon Corp. v. Eagerton*, 462 U.S. 176, 103 S.Ct. 2296, 76 L.Ed.2d 497 (1983). From those cases, it is clear that despite the apparent

absolute language of the contracts clause, there are cases where, in the legitimate exercise of a state's police power, statutes which impinge upon existing contractual rights can be validly enacted without contravening the constitutional prohibition. In each of the four cases cited, the Supreme Court first considered, as a threshold requirement, whether the effect of the statute was a substantial impairment of the complaining parties' contractual rights. In the first, second and fourth cases, such an impairment was found to exist. In the third case, it was not.

The law of Hawaii in 1953, when the lease was executed, was that a house built upon premises owned by another became a fixture and part of the realty (*Ahoi v. Pacheco*, 22 Haw. 257 (1914)), and a tenant's right to remove such a house if provided for in the lease, had to be exercised in accordance with the terms of the lease. *Akiona v. Kohala Sugar Co.*, 5 Haw. 359 (1885). The lease in question, when executed, provided exactly what the law of Hawaii, as pronounced by this court recognized.

The lease in question was for a period of 30 years at a rental of $75 per annum. Thus, the lessees paid to the lessors, during the 30-year period of the lease, a total of $2,250 in rent. Now, under the decree of the court below, the lessors are obliged, involuntarily, and at the sole option of the lessees, to pay what appellees estimate as between $100,000 and $140,000, in order to get the leased premises back, even though the lease has expired. To say that this is not a substantial impairment of appellants' contractual rights is absurd.

Moreover, if the appellants had known when they entered into the lease, that they would be obliged to purchase the lessees' improvements at the termination of the lease, they may well have bargained for a different rental, a different term, minimum or maximum building expenditures, and may very well have exercised their right of approval of lessees' plans for improvements on the premises, in a very different manner. The statute adds to lessees' rights, by giving them the additional option of receiving, in cash, and within 30 days from the judgment confirming the award, the value of their residential improvements. It correspondingly adds an additional burden to the lessors' obligations by requiring them, involuntarily, and at the option of the lessees, to purchase the improvements for cash within 30 days or face criminal penalties under HRS § 516-5. We have no hesitancy in holding that HRS

§ 516-70 very substantially impairs appellants' contractual rights.

Under the four cases cited, we must then next consider what public policy under the police power was sought to be furthered by HRS § 516-70, and whether it changes the contractual and property rights on reasonable conditions and is of a character appropriate to its public purpose.

The policy expressed in Section 1 of Act 184 of the Session Laws of 1975 reads:

SECTION 1. *Findings and purpose.* The legislature reaffirms its findings and declaration contained in section 1, Act 307, Session Laws of Hawaii 1967, and further finds as follows:

(a) The fee simple ownership of residential lands in the State is still concentrated in the hands of a small number of landowners. The state and federal governments and the largest 72 private landowners own approximately 95 per cent of all land area within the State. On Oahu alone, 22 major private landowners own 72.5 per cent of all land.

(b) The small number of landowners have continued to follow the policy of not selling their lands for residential use but of leasing their lands under longterm residential leases. While fee simple ownership still accounted for 68.9 per cent of all owner-occupied housing on Oahu in 1972, leasehold residential development has dominated the housing market since 1967 as it had during the period 1950 to 1967. Between 1950 and 1966, 40 per cent of all owner-occupied housing units developed on Oahu had been on leasehold. Between 1967 and 1972, 46 per cent of such development has been on leaseholds. In 1973, leaseholds constituted 32 per cent of all owner-occupied housing, more than double the percentage in 1960.

(c) The foregoing developments have compelled thousands of people in the State to resort to leaseholds to satisfy their housing needs, and this trend is likely to continue in view of the limited availability of land for residential purposes.

(d) Residential leaseholds have had and continue to have the following undesirable economic effects:

    (1) The scarcity of fee simple residential lands have pushed the price of fee simple residential units to high levels;

    (2) The high levels of fee simple residential unit prices have artificially raised the level of prices for leasehold units;

(3) The high prices commanded for leasehold units have encouraged the development of leasehold residential units and discouraged the development of fee simple units;

(4) The increases in the price for both fee simple and leasehold residential lands have caused lease rentals to increase on renegotiation of rentals (on the expiration of 25 or 30 years of initial fixed rent periods) ranging from 400 per cent to 1000 per cent, for renegotiated lease rentals are invariably tied to the fee simple value of the land on which the leasehold residences are situated, and these new lease rentals have at times exceeded the amount of the payments that the lessee had been making on the leasehold mortgages;

(5) Rental renegotiations have strongly favored the lessor, the lessee having little option but to consent to such rental as determined by the lessor or to give up the leasehold and home, although the lease may yet have 25 or more years to run;

(6) The inequality of bargaining power has allowed lessors to charge lease rent based not only on the raw land value of the property but also on the value of the offsite and onsite improvements which have already been paid for or will be paid for by the lessee and on the value accruing thereon;

(7) The high increases in lease rentals have caused leasehold values to drop after the initial fixed rent period (e.g., a house appraised at $68,000 before renegotiation of lease rental was increased), causing lessees opting to dispose of their leasehold interests to suffer severe economic losses.

(e) Residential leaseholds have also undesirable social effects. Lease rent negotiations are usually scheduled every 10 to 15 years after the initial fixed rent period of 25 to 30 years. Thus, as the lessee advances in age and his income potential declines, his lease rentals increase, causing him to give up the lease and to look for other accommodations. Then, when the entire lease period expires, the lessee who has stayed on the leasehold for the full term of the lease is, by reason of age,

income, and the lack of value remaining in the leasehold, left without means to purchase another home. These situations aggravated the already acute need for government-sponsored low and middle income and elderly housing. With the increasing number of elderly in this State, the problem promises to become even more acute in the foreseeable future, and will adversely affect the health and welfare of these people and the general welfare of the people of the State of Hawaii.

The legislature further finds and declares:

(1) That the land in Hawaii is to be considered as a source of life, dignity, and economic freedom for the men and women who reside on it;

(2) That it is the policy of the State that each person shall have the right of ownership of the land on which he makes his home;

(3) That it is also the policy of the State that the lessee of a residential unit, so long as he remains a lessee, shall have the right to have rentals set at reasonable levels and to enjoy his leasehold estate under reasonable leasehold terms;

(4) That the public health, safety, and welfare of the people of Hawaii demand that Act 307, Session Laws of Hawaii 1967, be fully implemented and that other applicable laws be enacted including legislation to prevent the imposition of confiscatory economic burdens upon the thousands of lessees presently living on leased property.

Nothing in the language just quoted adverts to, or addresses the mandated involuntary buy-out by lessors, at lessees' option, of leasehold improvements on the expiration of a lease already existing at the time of the adoption of the 1975 amendments to HRS § 516-70.

The conference committee reports with respect to the act both provide:

The purpose of this bill is to make more equitable and convenient *the opportunity for the conversion* of residential leasehold lands to fee simple ownership, and to clarify the rights and responsibilities of the *parties to these procedures*.

(Emphasis supplied.) They then go on to address the problem of oligopoly of ownership of land in fee simple. But with respect to

the particular section in question, the reports state only:

> Permit owners of residential improvements to recover the value of their onsite improvements upon the termination or expiration of the leases. Your Committee feels that this will provide an equitable solution for both lessees seeking equity at lease termination, and for lessors seeking to redevelop lands to contemporary use.

Conf. Comm. Rep. No. 24 on S.B. 1200, 1975 Sen. J. 863 *et seq.*; Conf. Comm. Rep. No. 27 on S.B. 1200, 1975 Hse. J. 894 *et seq.* Thus, the question posed is whether, in the exercise of police power, the State can, simply in order to do what it regards as equity, enact a statute which specifically changes an agreed upon, and material provision, in existing leases to the detriment of one party and the advantage of the other.

As the Supreme Court stated in *Allied Structural Steel Co. v. Spannaus*, 438 U.S. at 243:

> If the Contract Clause is to retain any meaning at all, however, it must be understood to impose *some* limits upon the power of a State to abridge existing contractual relationships, even in the exercise of its otherwise legitimate police power.

(Emphasis in original.)

In *U.S. Trust Co. v. New Jersey*, 431 U.S. at 22, the Supreme Court stated:

> Yet private contracts are not subject to unlimited modification under the police power. The Court in *Blaisdell* recognized that laws intended to regulate existing contractual relationships must serve a legitimate public purpose. [Citation omitted.] A State could not "adopt as its policy the repudiation of debts or the destruction of contracts or the denial of means to enforce them." [Citation omitted.] Legislation adjusting the rights and responsibilities of contracting parties must be upon reasonable conditions and of a character appropriate to the public purpose justifying its adoption.

In *Exxon Corp. v. Eagerton*, 462 U.S. at 191, the Supreme Court, in upholding the statute there under attack, noted:

> Like the laws upheld in these cases, the pass-through prohibition did not prescribe a rule limited in effect to contractual obligations or remedies, but instead imposed a generally applicable rule of conduct designed to advance "a broad societal

interest," [citation omitted]: protecting consumers from excessive prices.

Here we have a statute which has a substantial, material, and, as illustrated by the facts of the present case, even a drastic, and confiscatory effect, on existing contractual obligations, and property rights. The statute, moreover, is limited in effect, to contractual obligations and remedies, as distinguished from one imposing a generally applicable rule of conduct designed to advance broad societal interests.

If the expressed desire of the legislature to accomplish equity can justify this substantial and material change in the contractual obligations and remedies in all existing leases, it could also be used to justify changing any of the other material terms of existing lease agreements, such as rent, term of lease, etc. Such changes can be made in emergency situations and for limited periods. See *Home Building & Loan Association v. Blaisdell,* 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413 (1934). Here, there was no emergency and no limitation on the duration of the change.

This statute, as applied to leases already in effect, purely and simply, is an attempt by the legislature to change contractual remedies and obligations, to the detriment of all lessors and to the benefit of all lessees, without relation to the purposes of the leasehold conversion act; without the limitations as to leaseholds subject thereto contained in the conversion provisions; not in the exercise of the eminent domain power; but simply for the purpose of doing equity, as the legislature saw it. If there is any meaning at all to the contract clause, it prohibits the application of HRS § 516-70 to leases existing at the time of the 1975 amendment. Accordingly, that section, as applied to leases existing at the time of the adoption of the 1975 amendment, is declared unconstitutional. The order appealed from is reversed, and the case is remanded for further proceedings consistent herewith.

*Stanley K.W. Chong (Philip J. Leas* with him on the briefs; *Cades Schutte Fleming & Wright* of counsel) for appellants.

*Boyce R. Brown, Jr. (Brown & Johnston* of counsel) for appellees.
On the amicus curiae brief:
*Sonia Faust,* Deputy Attorney General, for State of Hawaii.