UNITED STATES of America

v.

**L. Robert FRAME, Sr., and Vintage Sales Stables, Inc.**

**Civ. A. No. 87–0474.**

United States District Court, E.D. Pennsylvania.

April 30, 1987.

---

Gail Walker, Civ. Div. Dept. of Justice, Washington, D.C., for plaintiff.

William H. Mitman, Jr., West Chester, Pa., for defendants.

## MEMORANDUM

CAHN, District Judge.

In this action the government seeks to recover monies allegedly due from defendants under the Beef Promotion and Research Act ("Act") of 1985, 7 U.S.C. §§ 2901 *et seq.* (Supp.1985). Since October 1, 1986, the Act has required purchasers of cattle such as defendants to collect a one dollar a head assessment from cattle producers to finance "a coordinated program of promotion and research designed to strengthen the beef industry's position in the marketplace and to maintain and expand domestic and foreign markets and uses for beef and beef products," 7 U.S.C. § 2901(b), which is administered by the Cattleman's Beef Promotion and Research Board ("Board").

There is no dispute that defendants, producers as well as purchasers of beef cattle, have failed to collect the assessments due under the statute; however, defendants defend this failure by arguing that the statute is unconstitutional. The government asserts the constitutionality of the statute and requests an order declaring that defendants have violated the Act, requiring compliance with an outstanding administrative subpoena, and enjoining any further operation of the defendants' livestock market until they comply with the Act. Before me is plaintiff's motion for partial summary judgment on the issue of liability and defendants' counterclaim for injunctive relief.

### The Statutory Scheme

The Beef Promotion and Research Act of 1985 directs the Secretary of Agriculture to establish, through a Beef Promotion and Research Order, a research and marketing program to bolster the troubled beef industry. 7 U.S.C. § 2901. On July 18, 1986, the Secretary issued the required order which became effective October 1, 1986. 7 C.F.R. §§ 1260.101 *et seq.* On that date purchasers of cattle, designated "collecting persons," began deducting a one dollar assessment from the purchase price paid to cattle farmers and importers for each head of cattle to finance the program. 7 U.S.C. § 2904(8)(A). Under the Act these assessments are remitted to either a state beef council, such as the Pennsylvania Beef Council, Inc. or the Board, a group of cattle producers appointed by the Secretary. *Id.*

The Board acts primarily through an Operating Committee ("Committee") comprised of ten members of the Board and ten members elected by a federation that includes the state beef councils. The Committee develops "promotion, research, consumer information and industry information plans or projects," 7 U.S.C. § 2904(4)(B), for the Secretary's approval and then implements the approved proposals. The total costs of collection of assessments and administrative staff incurred by the Board may not exceed five percent of the total projected assessments for any fiscal year.

The program may be short-lived. Within twenty-two (22) months after the effective date, the Secretary must conduct a referendum among beef producers to decide whether the program should be continued. If the program is not approved by a majority of those voting, the Secretary must terminate the program as soon as practicable. 7 U.S.C. § 2906. In addition, any producer who does not support the program may request a refund of his assessments under designated procedures. 7 U.S.C. § 2907(c). All refunds will be made subsequent to the producer referendum and the Secretary is required to maintain an escrow account equal to fifteen percent of assessments paid. 7 U.S.C. § 2907(b).

Finally, the Act authorizes the Secretary to request that the Attorney General initiate a civil action to enforce, and to prevent

and restrain a person from violating, any order or regulation promulgated by the Secretary pursuant to the Act. 7 U.S.C. §§ 2908(b), (c).

*Defendants' Arguments*

Defendants make four broad attacks on the constitutionality of the legislation:

1. The assessment is an unlawful delegation of the taxing power of Congress.
2. The assessment violates the Fifth Amendment because:
   a. it is a taking without just compensation for a private purpose; and
   b. it is a denial of equal protection (the whole burden falls on the farmer rather than butchers, etc.).
3. The assessment violates the First Amendment because:
   a. it violates defendants' right to freedom of association (forced to associate with the "Beef Board); and
   b. it violates defendants' right to freedom of speech (forced to express support of beef consumption).
4. The statute exceeds the limits of any expressed or implied grant of power to Congress under the Constitution (there is allegedly no power to create "a trade association").

For the reasons discussed below I will reject defendants' arguments and grant plaintiff's motion for partial summary judgment.

*Discussion*

I. *Does the Act Unlawfully Delegate the Taxing Power of Congress?*

Assuming, *arguendo*, that the Act is an exercise of Congress' taxing power under Article I, Section 8, Clause 1 of the Constitution, the actions taken by the Secretary of Agriculture pursuant to the Act do not constitute an unlawful exercise of authority by the executive. The test for determining whether there has been an unconstitutional delegation of legislative power is well settled. In *Hampton & Co. v. United States*, 276 U.S. 394, 48 S.Ct. 348, 72 L.Ed. 624 (1928), the Court stated that "[i]f Congress shall lay down *an intelligible principle* to which the person or body authorized to fix such rates is directed to conform, such legislative action is not a forbidden delegation of legislative power." (Emphasis added). *Accord National Cable Television Association, Inc. v. United States*, 415 U.S. 336, 342, 94 S.Ct. 1146, 1149–50, 39 L.Ed.2d 370 (1974); *Federal Energy Administration v. Algonquin SNG, Inc.*, 426 U.S. 548, 559, 96 S.Ct. 2295, 2302, 49 L.Ed.2d 49 (1976).

Since 1935, no statute has been held to violate this standard, and Justice Marshall has even remarked that "the notion that the Constitution narrowly confines the power of Congress to delegate authority to administrative agencies ... has been virtually abandoned." *National Cable Television*, 415 U.S. at 353, 94 S.Ct. at 1156, (Marshall, J. concurring). Although some recent commentary has suggested that the flexible standard enunciated in *Hampton* is too permissive because it allows Congress to avoid major policy decisions, *Schoenbrod, The Delegation Doctrine: Could the Court Give It Substance*, 83 Michigan L.Rev. 1223 (1985), the statute before me does not raise those concerns.

The Act clearly states all of the principal terms and conditions of the beef promotion and research program. Further, the Act dictates both the form and amount of the challenged assessment as well as the availability of a refund under certain circumstances. Certainly, this Act, which leaves the Secretary of Agriculture little, if any, discretion in drafting the major provisions of the program, gives the Secretary "an intelligible principle" on which to act. Therefore, the Act does not improperly delegate the legislative power of Congress.

II. *Is the Challenged Assessment an Unlawful Taking of Property for a Private Purpose?*

Defendants claim that the Act violates the Fifth Amendment to the U.S. Constitution by effecting a "taking" of their property for a "private" purpose. Neither the exercise of the taxing power or the commerce power generally constitutes a "taking" in the constitutional context. *See A. Magnano Co. v. Hamilton*, 292 U.S. 40, 44, 54 S.Ct. 599, 601, 78 L.Ed. 1109 (1934) (due

process clause only a limitation on the taxing power in "rare and special instances"); *American Power and Light Co. v. Securities and Exchange Commission,* 329 U.S. 90, 106, 67 S.Ct. 133, 142–43, 91 L.Ed. 103 (1946) (exercise of commerce power does not constitute a taking). Indeed, the power of Congress to impose taxes is almost immune from constitutional challenge. *See McCray v. United States,* 195 U.S. 27, 63, 24 S.Ct. 769, 779, 49 L.Ed. 78 (1904); Norton, *The Limitless Federal Taxing Power,* 8 Harv.J.L. & Pub.Pol'y 591 (1985).

■ The imposition of an assessment to finance a promotional and research program for beef products is not so arbitrary or unfair so as to be defined as a "taking." The assessment is enacted pursuant to a program specifically designed to benefit defendants. Moreover, the Act gives any producer the opportunity to apply for a refund of his assessment and provides for a producer's referendum on the program within twenty-two months of the program's inception. *See* 7 U.S.C. § 2906, 2907. Clearly, this limited interference with defendants' property does not rise to the level of a "taking" under the Fifth Amendment.

Further, although defendants are correct that their property may not be taken for a private use, *Hawaii Housing Authority v. Midkiff,* 467 U.S. 229, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984), logic and the language of the statute dictate the conclusion that the assessment is imposed for public use. The determination of public versus private use initially belongs to the legislature. *Berman v. Parker,* 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954). *See Keystone Bituminous Coal Association v. Debenedictis,* —— U.S. ——, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987). A court cannot substitute its judgment for the legislature's judgment as to what constitutes a public use "unless the use be palpably without reasonable foundation." *Hawaii Housing,* 467 U.S. at 241, 104 S.Ct. at 2329; *Debenedictis,* —— U.S. at ——, n. 16, 107 S.Ct. at 1243, n. 16.

The Act reflects the congressional view that support of the beef industry is in the public interest. Section 2(b) of the Act states:

It, therefore, is declared to be the policy of Congress that *it is in the public in-*

*terest to authorize the establishment,* through the exercise of the power provided herein, *of an orderly procedure for financing* (through assessments, on all cattle sold in the United States and on cattle, beef, and beef products imported into the United States) *and carrying out a coordinated program of promotion and research* designed to strengthen the beef industry's position in the marketplace and to maintain and expand domestic and foreign markets and uses for beef and beef products.

7 U.S.C. § 2901(b) (emphasis added). Similarly, Congress declared in §§ 2(a)(3) and (a)(4) that:

(3) beef and beef products should be readily available and marketed efficiently to ensure that the people of the United States receive adequate nourishment;

(4) the maintenance and expansion of existing markets for beef and beef products are vital to the welfare of beef producers and those concerned with marketing, using, and producing beef products, *as well as the general economy of the Nation....*

7 U.S.C. §§ 2901(a)(3) and (a)(4) (emphasis added). The enactment of several similar statutes demonstrates a continuing legislative intent to support the nation's economy by bolstering key industries. *See, e.g.,* 7 U.S.C. §§ 2701–18 (eggs); 7 U.S.C. §§ 3401–17 (wheat); 7 U.S.C. §§ 4501–14 (dairy). Support of the economy in this manner is comfortably within the boundaries of legislative discretion and, therefore, defendants' claim that the Act violates the Fifth Amendment must be rejected.

III. *Does the Act Deny Defendant the Equal Protection of the Law Guaranteed by the Fifth Amendment?*

Defendants argue that the Act unreasonably discriminates against them, and other beef producers, because the assessment is taken only from producers while the benefits of the advertising campaign inure to all who participate in the beef industry, e.g. packers, processors, sellers, etc. However, in formulating taxation legislatures possess the greatest freedom of classification.

*Regan v. Taxation with Representation,* 461 U.S. 540, 547–48, 103 S.Ct. 1997, 2001–02, 76 L.Ed.2d 129 (1983). A taxing authority may "impose different specific taxes upon different trades and professions and may vary the excise upon various products. It is not required to resort to close distinctions or maintaining a precise, scientific uniformity...." *Allied Stores v. Bowers,* 358 U.S. 522, 527, 79 S.Ct. 437, 440–41, 3 L.Ed.2d 480 (1959). In summary, if the classification is rationally related to a legitimate government interest the tax does not violate the right to equal protection.

This same "rational basis" standard applies if the assessment is analyzed under Congress' power under the commerce clause. *See City of New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 2516–17, 49 L.Ed.2d 511 (1976) ("this Court consistently defers to legislative determinations as to the desirability of particular statutory discriminations [when economic regulation is challenged] ").

■ A rational basis exists for the assessment of beef producers to support the Board's activities. Congress could have found that a tax on the initial sale of cattle was easier to apply than a smaller tax at every level of the beef industry. Also, Congress could have found that cattle farmers would be the most benefitted by the plan or could pass the assessment on to others in the industry.[1] Finally, Congressional experience with other commodities, *See, e.g.,* 7 U.S.C. § 2707(e) (assessment on egg producers); 7 U.S.C. § 4306(5) (assessment on flower producers); 7 U.S.C. 4504(g) (assessment on milk producers), could have led Congress to believe that an assessment on the initial sale of a commodi-

ty is the appropriate manner to raise revenue for promotion and research programs.

The foregoing list of potential rationales for the Act may include motives which some may find unwise, improvident, or out of harmony with a particular school of thought; however, Congress is accorded wide latitude to make such "mistakes". *See Williamson v. Lee Optical Co.,* 348 U.S. 483, 488, 75 S.Ct. 461, 464–65, 99 L.Ed. 563 (1954); *City of New Orleans,* 427 U.S. at 304–305. The proper recourse of those individuals who feel burdened by government taxation or regulation is the legislature. As Chief Justice Marshall stated in *Gibbons v. Ogden:*

> The wisdom and the discretion of Congress, their identity with the people, and the influence which their constitutents possess at elections, are in this, as in many other instances, ... the sole restraints on which [citizens] have relied to secure them from its abuse. They are the restraints on which the people must often rely solely, in all representative governments.

22 U.S. (9 Wheat.) 1, 6 L.Ed. 23 (1824). These avenues remain open to defendants.

Because a rational basis exists for the assessment of beef producers the Act does not violate defendants' right to equal protection of the law under the Fifth Amendment.

### IV. *Does the Act Violate Any of Defendants' Rights Under the First Amendment?*

■ Defendants next claim that the Act violates both their freedom of association and freedom of speech under the First Amendment to the U.S. Constitution. Al-

---

1. Defendants have presented an affidavit challenging the ability of farmers to raise the price of their cattle to recoup the cost of the assessment. See Affidavit of John H. Avery at 4–5. In the short term farmers are indeed "price takers" and forced to accept or reject the auction price for live beef. However, in the long run additional demand for beef may raise the auction price and allow the farmers to recapture their short term losses. See affidavit of Leonard J. Haverkamp at 4.

I find that further evidentiary hearings on this issue are unnecessary. Even if this debate over the ability of farmers to recapture the assessment is resolved in favor of defendants it does not affect the other rational bases for the program. Further, Congress may have believed that a tax on the end product would be directly passed on to the farmer in any event or that an increase in the short term retail price of beef was in direct conflict with the Act's goal of increased demand. Under either scenario the placing of the entire short term burden on the farmer is not irrational.

though defendants are correct that they are entitled to refuse to associate with other persons and entities, *Roberts v. United States Jaycees*, 468 U.S. 609, 617–18, 622–23, 104 S.Ct. 3244, 3249–50, 3251–53, 82 L.Ed.2d 462 (1984), they have cited no cases, and my independent research has uncovered none, in which a valid exercise of Congress' taxing power violated the First Amendment. This is not surprising given the broad implications of defendants' position. If every individual had a constitutional right to refuse to "associate" with a government program through the payment of taxes or some other valid exercise of Congressional power the ability of the government to enact controversial programs and effectuate the will of the majority would collapse. Defendants are being required to "associate" with the Beef Promotion Program no more than any taxpayer is required to associate with armed forces advertisements, Social Security, or the Voice of America. Therefore, I must reject defendants' argument that this "association" violates their rights under the first amendment.

■ Similarly, defendants argue that the Act violates their freedom of speech by requiring them to support the promotion of the beef industry. This claim is also without merit. Defendants rely heavily on the holdings in *Wooley v. Maynard*, 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977) and *Board of Education v. Barnette*, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943); however, both cases are inapposite to the facts before me. In *Wooley*, the Court struck down a New Hampshire statute's requirement that each automobile license plate carry the slogan "Live Free or Die" because it required the Maynards to "use their private property as a 'mobile billboard' for the state's ideology message." *Wooley*, 430 U.S. at 715, 97 S.Ct. at 1435.

In this case defendants argue that the government cannot use defendants' their money to erect its own billboard. Such a result does not follow from *Wooley*. The speech here is made by the government not the taxpayers and, therefore, does not violate their right to express their views on the virtues of beef consumption. In *Bar-*

*nette*, the Court struck down a statute which required public school students to recite the pledge of allegiance to the United States flag. *Barnette*, 319 U.S. at 633–34, 63 S.Ct. at 1182–83. Again, the speech attacked in *Barnette* is coerced *private* speech, not the government speech at issue here.

Many citizens may disagree with the government's position on controversial issues. The first amendment stands ready to protect their right to voice their disagreement. However, it would indeed be a strange result to invoke the same amendment to limit the right of the government to express its views by requiring that the government allow any individual who disagrees with government speech to opt out of his obligation to contribute to its cost. I refuse to adopt such a position and, therefore, defendants' arguments under the first amendment must be rejected.

## V. *Does the Act Exceed the Limits of Congressional Power?*

■ Defendants' final argument is that the act exceeds the limits of any express or implied grant of power to Congress under the Constitution because it creates "a private trade association." I disagree. Congressional power under the Commerce Clause of the Constitution, Art. I, § 8, Cl. 3, is quite broad and extends to "activities affecting [interstate] commerce" *Hodel v. Virginia Surface & Mining Reclamation Association*, 452 U.S. 264, 276–77, 101 S.Ct. 2352, 2360, 69 L.Ed.2d 1 (1981). More specifically, the Court has declared that "[t]he stimulation of commerce is a use of the regulatory function quite as definitely as prohibitions or restrictions thereon." *Wickard v. Filburn*, 317 U.S. 111, 128, 63 S.Ct. 82, 90–91, 87 L.Ed. 122 (1942).

Clearly, the beef industry affects interstate commerce and is a proper object of congressional legislation. Defendants' objection is more properly focused (albeit unsuccessfully) on the method by which Congress financed the program, rather than the program's existence. Therefore, I must reject defendants' argument.

In conclusion, this is not a statute in which Congress has exceeded its broad authority under the constitution; rather it reflects Congress' view that a coordinated response is needed to reverse the recent declines in the beef industry. As such it violates none of defendants' constitutional rights under either the first or fifth amendments. Acceptance of defendants' positions would embroil the courts in litigation on every controversial government program. The legislature has wide latitude to act in what it perceives to be the public interest, even if certain groups find the action inappropriate. I will not overturn their judgment in this matter. An appropriate order follows.

### ORDER

AND NOW, this 28th day of April, 1987, upon consideration of the motion of the United States of America for partial summary judgment IT IS ORDERED as follows:

1. The motion of the United States for partial summary judgment on the issue of the liability of the defendant for all monies due pursuant to the Beef Promotion and Research Act of 1985, 7 U.S.C. §§ 2901, *et. seq.* (Supp.1985) ("Act") is GRANTED.

2. Defendants shall file all reports required by the Act within a reasonable period from the date of this order.

3. Defendants shall produce to the Secretary of Agriculture, or any authorized representative, such materials reasonably required by the Secretary to determine defendants' liability under the Act.